**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

| | | |
|---|---|---|
| MOUNTAINTRUE and CENTER FOR BIOLOGICAL DIVERSITY, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Case No. 1:25-cv-393 |
| UNITED STATES FOREST SERVICE, ACTING FOREST SUPERVISOR CAVAN FITZSIMMONS, and APPALACHIAN DISTRICT RANGER JEN BARNHART, | ) ) ) ) ) | **COMPLAINT** |
| Defendants. | ) ) | |

## <u>INTRODUCTION</u>

1.      This case challenges a U.S. Forest Service timber sale on the Pisgah National Forest. Before authorizing the timber sale (the "Poplar timber sale" or "Project"), the Forest Service failed to prepare an environmental document, as required under the National Environmental Policy Act, 42 U.S.C. § 4332, and failed to comply with the requirements of the Pisgah Forest Plan, as required by the National Forest Management Act, 16 U.S.C. § 1604. Instead, the Forest Service unlawfully entered a contract with a logger to harvest timber and closed the area to the public. Logging has already begun.

2.      The Poplar timber sale is located at the head of the Nolichucky River Gorge—one of the deepest, wildest, and most spectacular river gorges in the Southeast. Because of the Gorge's outstanding ecological and recreational values, the Pisgah Forest Plan manages the majority of the Gorge, including significant portions of the timber sale area at issue here, to promote old-growth forests, unroaded characteristics, and scenic vistas. Under the Pisgah Forest Plan, logging and logging roads are strictly limited in this area.

3.  In late September 2024, the Pisgah National Forest experienced flooding and heavy winds during Hurricane Helene. Those winds blew down trees in pockets of forest across the Pisgah National Forest, including in the Nolichucky River Gorge.

4.  In the wake of Helene, the Pisgah National Forest sought and received authorization from the Forest Service's Washington Office to conduct emergency salvage logging in multiple project areas using "alternative procedures" under the National Environmental Policy Act, contemplating that those timber sales would be under contract by May 1, 2025. The Pisgah National Forest's Emergency Response request was granted on February 26, 2025 for a discrete set of locations specifically identified in Enclosure A of the decision document.

5.  In that authorization, however, the agency did <u>not</u> seek or receive approval to conduct salvage logging in the Project area. That area is not included in the list of locations provided in Enclosure A of the decision document.

6.  Months after the May 1, 2025 deadline passed, the Forest Service saw an opportunity it had previously overlooked to conduct salvage logging in the Project area, courtesy of a temporary bridge installed by CSX Transportation for the purpose of rebuilding a railroad track through the Nolichucky River Gorge. However, the window of opportunity was short; permit conditions set by the U.S. Army Corps of Engineers required the bridge to be removed by November 4, 2025. As a result, the Forest Service moved ahead with the new Project without first complying with public notice and environmental review requirements.

7.  The only publicly available document related to the Poplar timber sale is a closure order depicting the area closed to the public between September 15, 2025, and April 30, 2026. The closure order does not disclose that logging would occur during that time.

8. The parcel subject to the closure order is approximately 135 acres, but only a subset of the area was substantially impacted by storm damage. On the northern and western slopes of the ridge bisecting the parcel, most of the forest is intact. In addition, much of the Project area is required by the Forest Plan to be managed for restoration of old-growth forests and natural disturbances (including from storms and fire).

9. Plaintiffs MountainTrue and the Center for Biological Diversity, as participants in recovery efforts related to Hurricane Helene, understand the importance of that work. They have also seen the extraordinary harm caused by rushed, poorly planned, and opaque projects carried out in the name of hurricane response. Plaintiffs therefore seek to ensure that the Forest Service follows the basic requirements of law—including notice and analysis requirements and the provisions of its own Forest Plan—during a response that will continue for years, if not decades. Despite repeated entreaties to the Forest Service regarding the Poplar timber sale, the agency has refused to remedy the legal violations and commit to avoiding unlawful damage to the Project area's outstanding biological and recreational resources.

10. As of October 29, 2025, logging within the Project area had already begun. On information and belief, logging may be scheduled to finish as soon as November 17, 2025.

11. Accordingly, Plaintiffs request that the Court enjoin the Poplar timber sale, set aside any instrument purporting to allow the removal of timber from the Project area, and remand to the Forest Service. Plaintiffs also seek declaratory and injunctive relief.

## JURISDICTION AND VENUE

12. This action arises under the laws of the United States, including the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*., National Forest Management

Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*, and Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06.

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1346(a)(2) (United States as defendant), and 5 U.S.C. § 702 (APA judicial review). This Court may issue a declaratory judgment and further relief requested pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

14.     Defendants' authorization of the Poplar timber sale is a "final agency action" within the meaning of the APA and accordingly is judicially reviewable under § 704 of that act. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); 5 U.S.C. § 551(13) (defining "agency action" for purposes of APA review to include "license[s]," which are further defined as "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission," 5 U.S.C. § 551(8)).

15.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(B) because Defendants are agencies, officers, or employees of the United States acting in their official capacities, and a substantial part of the events or omissions giving rise to the claims occurred in the District. Venue is also proper in this District under 28 U.S.C. § 1391(e)(1)(C) because Defendants are agencies, officers, or employees of the United States acting in their official capacities, no real property is involved in this action, and Plaintiff MountainTrue is headquartered in the District.

## PARTIES

### Plaintiffs

### MountainTrue

16.     MountainTrue is a nonprofit corporation with its principal office in Asheville, North Carolina, and smaller offices in Saluda, Boone, and Murphy, North Carolina.

MountainTrue was founded in 1982 to protect the national forests surrounding Asheville from the Forest Service's abusive logging practices. Today, MountainTrue champions clean water, resilient forests, and healthy communities in the Southern Blue Ridge Mountains. Its core mission remains focused on protecting the Pisgah, Nantahala, and Cherokee National Forests. MountainTrue has invested significant time and resources advocating for protection of the outstanding biological resources on the Pisgah National Forest, including the Nolichucky River Gorge.

17.     Members and staff of MountainTrue, including Josh Kelly, frequently recreate in the Nolichucky River Gorge. Within this area, Mr. Kelly has enjoyed viewing native stands of old-growth forest, as well as numerous rare and native plants and animals, including the threatened *Virginia spirea*. Mr. Kelly intends to regularly return to this area to hike, camp, study plants, bird watch, run, ride bicycles, conduct research, take photographs, fish, and observe rare and threatened species for as long as he is able. As a disturbance ecologist, Mr. Kelly sees great value in restoring natural disturbances and he looks forward to observing the recovery of these forests in the absence of human intervention.

18.     The Poplar timber sale threatens the scientific, aesthetic, recreational, and spiritual interests of MountainTrue members and staff like Mr. Kelly. These harms include the removal of biological legacies like downed and damaged trees, the cutting of live trees within the Project area, the building of roads that will cause erosion on steep slopes and fragile soils, sedimentation of the Nolichucky River, introduction of non-native invasive plants, and impacts to rare species that Mr. Kelly enjoys viewing. These harms are significant and irreparable because they will permanently change the ecological trajectory of the Project area. Rather than recovering naturally, the area will be marred by roads and infestations of invasive plants, rare

species will be permanently displaced, and the forest stands that Mr. Kelly values due to their wild, natural, and unroaded character will be fragmented and altered by human intervention. These actual or imminent, concrete, and particularized injuries to MountainTrue and its members and staff would be redressed by an order from this Court enjoining the Poplar timber sale, setting aside any instrument purporting to allow the removal of timber from the Project area, and remanding to the Forest Service.

### Center for Biological Diversity

19.     The Center for Biological Diversity ("the Center") is a national nonprofit organization with its Southeast Program headquarters in Asheville, North Carolina. The Center was founded in 1989 with the belief that the welfare of human beings is deeply linked to nature, and specifically to the existence of a vast diversity of wild animals and plants. The Center's mission is to secure a future for all species, great and small, hovering on the brink of extinction by use of science, law, and creative media, with a central focus on protecting the lands, waters, and climate that species need to survive. In the Southeast, lawful and responsible stewardship of national forest lands, including the Pisgah National Forest, is a fundamental priority for the Center.

20.     Members and staff of the Center, including Will Harlan, frequently recreate in the Pisgah National Forest and the Nolichucky River Gorge. Mr. Harlan enjoys paddling the Nolichucky River with his two sons and snorkeling for eastern hellbenders and other aquatic life. Mr. Harlan, like other members of the Center, has also visited the area to survey for rare species of plants and wildlife. Mr. Harlan intends to regularly return to this area and nearby portions of

the Pisgah to paddle, snorkel, hike, camp, run, and observe rare and threatened species, for as long as he is able.

21.     The Poplar timber sale threatens the aesthetic, recreational, and spiritual interests of Center members like Mr. Harlan. These harms are significant and irreparable because the impacts of logging and road construction in the Project area, which Mr. Harlan sees each time he goes to the Poplar Boat Launch, will be visible for years to come. The salamanders and other wildlife Mr. Harlan values and enjoys searching for cannot inhabit logged forest stands, and the effects of sedimentation in the river will degrade habitat for the aquatic species he enjoys observing. Recently he has avoided taking his sons back to the Poplar Boat Launch to not ruin their cherished memories of paddling the Gorge. These actual or imminent, concrete, and particularized injuries to the Center and its members and staff would be redressed by an order from this Court enjoining the Poplar timber sale, setting aside any instrument purporting to allow the removal of timber from the Project area, and remanding to the Forest Service.

<u>**Defendants**</u>

**United States Forest Service**

22.     Defendant United States Forest Service is a federal agency within the United States Department of Agriculture. The Forest Service is charged with stewarding the 500,000-acre Pisgah National Forests in North Carolina, including the relevant portions of the Nolichucky River Gorge.

23.     The Forest Service is responsible for authorizing timber sales on national forest system lands, including the Poplar timber sale challenged here. The Forest Service is also responsible for ensuring that its timber sales comply with the Pisgah Forest Plan, as well as NEPA, NFMA, the APA, and applicable implementing regulations.

**Acting Forest Supervisor Cavan Fitzsimmons**

24.     Defendant Cavan Fitzsimmons is the Acting Forest Supervisor for the Forest Service's National Forests in North Carolina administrative unit which includes the Pisgah National Forests. Defendant Fitzsimmons is ultimately responsible for ensuring that the Poplar timber sale complies with the Pisgah Forest Plan and other applicable environmental laws. Defendant Fitzsimmons is sued in his official capacity.

**District Ranger Jen Barnhart**

25.     Defendant Jen Barnhart is the District Ranger for the Appalachian Ranger District, where the Poplar timber sale is located. Upon information and belief, Defendant Barnhart entered into the contract purporting to authorize logging in the Project area. Defendant Barnhart is sued in her official capacity.

**LEGAL BACKGROUND**

**National Environmental Policy Act**

26.     NEPA requires federal agencies to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man" "to the fullest extent possible." 42 U.S.C. §§ 4321, 4332.

27.     NEPA "ensures that the agency and the public are aware of the environmental consequences of proposed projects. Properly applied, NEPA helps agencies to make better decisions and to ensure good project management." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1510 (2025).

28.     NEPA has twin aims: "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its

decisionmaking process." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (quotations omitted).

29.     NEPA's objectives are "realized through a set of 'action-forcing' procedures that require that agencies take a hard look at environmental consequences, . . . and [] provide for broad dissemination of relevant environmental information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quotations omitted).

30.     These action-forcing procedures require agencies to complete certain requirements for "every" "proposal[]" for "major Federal action." 42 U.S.C. §§ 4332, 4336.

31.     A "proposal" exists if "an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects." *Id.* § 4336e(12).

32.     A "major Federal action" means "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10).

33.     If a proposal for major federal action "has a reasonably foreseeable significant effect on the quality of the human environment," the agency "shall issue" a "detailed" "environmental impact statement" ("EIS"). *Id.* §§ 4332(2)(C), 4336(b)(1). If a "proposed agency action . . . does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown," then the agency "shall prepare" a "concise" "environmental assessment" ("EA") that "set[s] forth the basis of such agency's finding of no significant impact or determination that an [EIS] is necessary." *Id.* § 4336(b)(2).

34.     Agencies are relieved of the obligation to prepare an EA or EIS only if "the agency finds that the proposed agency action" is categorically excluded from further review or NEPA study is barred by "another provision of law." *Id.* § 4336(b)(2).

35.     A proposed action may only be categorically excluded from further analysis and documentation in an EIS or EA if (1) the action falls within an appropriate category and (2) "there are no extraordinary circumstances related to the proposed action." 7 C.F.R. § 1b.3(e)–(f). Extraordinary circumstances include "[f]ederally listed threatened or endangered species," "designated critical habitat," "species proposed for Federal listing," "[f]lood plains" or "other such sensitive areas," "wild and scenic rivers," "national natural landmarks," "[s]pecially managed areas," or "[i]mportant . . . forest" lands, among other factors. *Id.* § 1b.3(f).

36.     Application of a categorical exclusion ("CE") requires documentation that a valid CE applies and no "extraordinary circumstance" exists. *Id.* § 1b.3(g).

37.     The documentation for an EIS, EA, or CE must be prepared before the action can begin, *id.* §§ 1b.3(j); 1b.6(f); 1b.8(e), unless the Forest Service has an emergency authorization to proceed "before the NEPA process can be completed," *id.* § 1b.9(w). For an EIS-level analysis, such an authorization must be jointly approved by the Department of Agriculture and the Council on Environmental Quality. *Id.* § 1b.9(w)(2). For an EA- or CE-level analysis, the emergency authorization may be issued by the Forest Service's Chief or Associate Chief. *Id.* § 1b.9(w)(1)(iv). In any case, emergency authorizations are limited to "actions necessary to address the emergency circumstance." *Id.* § 1b.9(w)(1)–(2).

**The National Forest Management Act**

38.     NFMA requires the Forest Service to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). Any activity that occurs on a national forest "shall be consistent" with the governing land and resource management plan, also known as a forest plan. *Id.* § 1604(i); 36 C.F.R. § 219.15(d).

39.     Forest plans "provide a framework for where and how certain activities can occur in national forests." *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582, 600 (4th Cir. 2018). They do this in two primary ways.

40.     First, forest plans direct the course of activity on a national forest over the life of the forest plan. In forest planning terminology, this is achieved by establishing "desired conditions," which are "description[s] of specific social, economic, and/or ecological characteristics . . . toward which management of the land and resources should be directed," 36 C.F.R. § 219.7(e)(1)(i), and "objectives" which are "concise, measurable, and time-specific statement[s] of a desired rate of progress toward a desired condition or conditions," *id.* § 219.7(e)(1)(ii). In combination, the Forest Service establishes desired conditions and sets objectives for achieving them; subsequent Forest Service "project[s]" implement these objectives. *Id.* § 219.7(e).

41.     Second, forest plans establish "standards" and "guidelines" that govern projects implementing forest plan objectives. A "standard" is a "mandatory constraint on project and activity decisionmaking, established to help achieve or maintain the desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirement;" a "guideline" is also a constraint on future projects, but it "allows for departure from its terms, so long as the purpose of the guideline is met." *Id.* § 219.7(e)(1)(iii)–(iv).

42.     Forest plan standards and guidelines are generally developed at two levels. First, forest plans commonly include "forest-wide" standards and guidelines that apply to activities across the national forest unit. Second, forest plans generally develop standards and guidelines for individual "management areas,"—*i.e.* subsets of the national forest unit. *Id.* §§ 219.7(d), 219.19.

11

43.     The Poplar timber sale is currently governed by the 2023 Forest Plan for the Pisgah National Forest. *See* U.S. Forest Serv., *Nantahala and Pisgah National Forests Final Land Management Plan*, R8 MB-160 (Jan. 2023) (hereinafter "Forest Plan").

44.     The Forest Plan includes forest-wide standards and guidelines that apply to the Poplar timber sale, including two relevant here.

45.     Guideline PAD-G-02 provides that when a state-designated Natural Heritage Natural Area is present within a project area, "coordination should occur with the [North Carolina] Natural Heritage Program early during project development to discuss the unique ecological values present, their locations, the representativeness and quality of these values, and potential management treatments." Forest Plan at 81.

46.     Standard PAD-S-04 provides that project-level field surveys for rare species "shall be conducted when": (1) the "proposed treatment area has a potential for occupancy"; (2) "[p]roject activities may affect the population or habitat of a federally listed species or [species of conservation concern]"; (3) "[a]dequate population inventory information is unavailable"; and (4) "[i]nformation on number and location of individuals and habitat conditions would improve project design, the application of mitigations to reduce adverse effects, or the assessment of effects of the population." Forest Plan at 80.

47.     In addition to including several applicable forest-wide provisions, the Forest Plan also includes management-area-specific standards and guidelines that apply to the Poplar timber sale. The Poplar timber sale itself takes place in five different management areas, three of which are relevant here: Backcountry, Designated Old Growth Network, and Wild and Scenic Rivers.

48.     According to the Forest Plan's desired conditions, Backcountry areas should comprise "[l]arge blocks of remote and unroaded forest [that] appear to be primarily shaped by

natural processes, where old growth characteristics develop and dominate large parts of these areas over time." Forest Plan at 218 (BAC-DC-01). The "cutting, sale, or removal of timber in these areas is expected to be infrequent." *Id.*

49. Forest Plan standards provide that timber may not be cut, sold, or removed from Backcountry areas, except to meet four purposes: (1) to improve "threatened, endangered, or proposed species habitat;" (2) to maintain or restore "the characteristics of ecosystem composition and structure;" (3) the "cutting, sale or removal of timber [that] is incidental to the implementation of a management activity not otherwise prohibited;" or (4) the "cutting, sale, or removal of timber is needed and appropriate for personal or administrative [i.e., noncommercial] use." *Id.* at 219 (BAC-S-02 & BAC-S-03).

50. According to the Forest Plan's desired conditions, lands in the Designated Old Growth Network should be managed for "large, downed woody debris, abundant snags, variable gap sizes, tip-up mounds, and undisturbed soils." *Id.* at 84–85 (OGN-DC-02).

51. Forest Plan standards provide that management activities in the Designated Old Growth Network, including logging, are permitted only to "enhance old growth values and characteristics," including "[d]owned logs in all stages of decay" and "multiple tree gaps," or to "improve forest health or prevent the spread of disease." *Id.* at 85 (OGN-S-01). Further, "new road construction" is allowed within the Designated Old Growth Network only "after all feasible and prudent alternatives have been analyzed in the NEPA process and all impacts to old growth characteristics are minimized." *Id.* (OGN-S-03).

52. According to the Forest Plan's desired conditions, lands in the Wild and Scenic Rivers management area that are classified as "scenic"—like the Nolichucky—should be "mostly undeveloped." *Id.* at 259 (WSR-DC-05). Disturbances should primarily be "caused by

natural processes," and timber harvest is "acceptable" only if the forest continues to "appear[]
natural from the riverbank." *Id.* at 260 (WSR-DC-05).

53.    Forest Plan standards provide that "management projects and activities shall not
reduce the characteristics of the rivers and adjacent lands within a ¼ mile on either side of the
river segment (river corridor) such that the rivers no longer qualify for their identified
classification." *Id.* at 261 (WSR-S-04). Because river segments designated as "scenic" have a
"High" scenic integrity objective, *id.* (WSR-DC-09), any logging must be preceded by a project-
level scenery impact analysis demonstrating that the impact will not last longer than two full
growing seasons, *id.* at 129 (SC-S-01 & SC-S-03).

## Administrative Procedure Act

54.    Review of timber sales under NEPA and NFMA occurs under the APA. The APA
creates a right to judicial review for plaintiffs wronged by federal agency action when the law
being enforced does not provide its own cause of action.

55.    Specifically, the APA requires courts to "set aside agency action" that is
"arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with the law," or
that was completed "without observance of procedure required by law." 5 U.S.C. § 706(2).

56.    Agency action is arbitrary and capricious where, among other things: the agency
"entirely failed to consider an important aspect of the problem, offered an explanation for its
decision that runs counter to the evidence before the agency, or is so implausible that it could not
be ascribed to a difference in view or the product of agency expertise," or where the agency's
action is not based on a "reasoned analysis." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm
Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983).

57.    Ultimately, "the agency must examine the relevant data and articulate a
satisfactory explanation for its action including a 'rational connection between the facts found

and the choice made.'" *Id.* at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Further, an agency's explanation must be contemporaneous with the decision as post hoc rationalizations are an impermissible basis for APA review. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,* 591 U.S. 1, 21 (2020) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 410 U.S. 402, 420 (1971)).

58.     The APA also provides relief to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). A "claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted).

## FACTUAL BACKGROUND

### The Project Area

59.     The Poplar timber sale is located along the Nolichucky River near the small community of Poplar, North Carolina.

60.     The Nolichucky River flows approximately 100 miles from the confluence of the North Toe and Cane Rivers near Huntdale, North Carolina, before emptying into Douglas Lake, Tennessee.

61.     The heart of the river system is the majestic Nolichucky Gorge—an approximately 7.2-mile section of river that flows through one of the deepest gorges in the Southeast. The Project area is located on Pisgah National Forest land within the 7.2-mile Gorge section.



Figure 1: Nolichucky River Gorge and Approximate Area covered by Poplar timber sale

62.     As described by the Forest Service, the Nolichucky Gorge is "one of the deepest, most spectacular gorges in the eastern United States," where "forest-covered slopes rise to more than 2,000 feet adjacent to the river." U.S. Forest Serv., *Wild and Scenic River Study Report and Final Environmental Impact Statement on the Nolichucky River*, iii (1994).

63.     Congress designated the Nolichucky River as a potential Wild and Scenic River in 1975, to be further studied for potential inclusion in the Wild and Scenic River system. P.L. 93-621(a)(45) (Jan. 3, 1975) (amending 16 U.S.C. § 1276).

64.     In 1994, the Forest Service formally recommended that the Gorge section of the river be designated by Congress as a Wild and Scenic River. In 2023, the Forest Service finalized the Forest Plan, which designates the North Carolina portion of the Gorge as an "eligible" Wild

and Scenic River segment that must be protected for its "outstandingly remarkable values" of scenery, geology, and fish. Forest Plan at 257.

65. Due to its outstanding biodiversity and ecological significance, the North Carolina Natural Heritage Program has designated portions of the Nolichucky Gorge as Natural Heritage Natural Areas with "exceptional" or "high" values.

66. In addition to providing a home for state-designated rare species, the Nolichucky River Gorge is also home to multiple proposed and federally listed species. For example, the Gorge contains known populations of the Eastern hellbender—the largest salamander in North America, which is a proposed endangered species. The Gorge is also home to species currently protected under the Endangered Species Act, including: *Virginia spiraea*, a threatened plant that can be found along the Nolichucky's riverbanks; the endangered Indiana bat, northern long-eared bat, and gray bat, which use the Gorge as foraging and roosting habitat; and the Appalachian elktoe—a critically endangered mussel that inhabits the Nolichucky's waters.

## Hurricane Helene and Forest Service Response

67. On September 26 and 27, 2024, Hurricane Helene swept into western North Carolina, unleashing torrents of rain and strong winds.

68. According to Forest Service estimates, the storm's flooding and winds caused widespread damage across the National Forests in pockets of blown-down trees.

69. On February 24, 2025, the Cherokee and Pisgah National Forests formally requested the U.S. Forest Service Chief's approval to use emergency response authority for compliance with NEPA. 36 C.F.R. § 220.4(b)(2) (2008) (now codified at 7 C.F.R. § 1b.9(w)). Among other activities, the Cherokee and Pisgah requested authorization to conduct "debris removal" in specific mapped "polygons" via salvage logging.

70.     The Poplar timber sale was not among the debris removal areas identified in the Cherokee and Pisgah's emergency authority request.

71.     On February 26, 2025, the U.S. Forest Service Chief's office approved the Cherokee and Pisgah's request to use emergency response authority to respond to the immediate impacts of Hurricane Helene—i.e., those impacts "that still pose an urgent public health and safety concern . . . [and] need to be implemented as soon as possible." U.S. Forest Serv., *Decision Memorandum for the Chief: Emergency Response Authority Request* (Feb. 26, 2025) (Exhibit 1) (hereinafter "Emergency NEPA Authorization").

72.     The Emergency NEPA Authorization covered actions to "[r]educe significant fuel loading," including salvage harvest, on specifically identified and mapped "debris removal" areas. These polygons were identified when one or more criteria were met: (1) the project area occurred within the wildland-urban interface; (2) debris blocked existing access for a prescribed fire unit or inholdings; (3) the proposed project was in close proximity to the Appalachian Trail; or (4) the project area posed a risk to downstream primary municipal drinking water sources. *Id.*

73.     Consistent with the authorization's limitation to immediately needed actions, the Emergency NEPA Authorization covered emergency-response actions only if they were under contract by May 1, 2025 and completed by May 1, 2026.

74.     The Poplar timber sale project area was not among the debris removal areas identified in the Chief's Emergency NEPA Authorization.

**Poplar Timber Sale**

75.     The Project area for the Poplar timber sale comprises approximately 135 acres within the Nolichucky River Gorge. The precise acreage is unavailable to Plaintiffs because the Forest Service has not been willing to share that information.

76.     The Project area consists of two parcels, one on each side of the river, connected by a temporary bridge constructed by CSX for the purpose of rebuilding its railroad track. The larger parcel, about 120 acres, is located on the river's left bank. This parcel is bisected by a ridge of Flattop Mountain, which runs generally north to south.



Figure 2: Overlay of Project Area with Post-Helene Aerial Imagery

77.     Under the Forest Plan, the western side of this ridge is designated as Backcountry. This same area is also included in the Pisgah National Forest's Designated Old Growth Network.



Figure 3: Management Areas under the Forest Plan



Figure 4: Designated Old Growth Network

78.     The western side of the ridge was not severely affected by the storm. According

to Forest Service data, most trees are still standing in the northern and western portions of the

Project area—including the trees within the portion of the Project area that falls in Backcountry and Designated Old Growth Network management areas.



Figure 5: Overlay of Project Area with U.S. Forest Service Southern Research Station Mapping of Hurricane Helene Damage

79.    Portions of the Poplar timber sale also occur in the management area governing Wild and Scenic Rivers. According to the Forest Plan, the Nolichucky River Gorge is classified as an eligible "scenic" river segment. Forest Plan at 257.

80.    Most of the Project area covered by the Wild and Scenic Rivers management area contains intact, standing trees.

81. Portions of the Project area also occur in the ecologically "exceptional" Nolichucky Gorge Natural Heritage Natural Area designated by the North Carolina Natural Heritage Program.

82. Most of the Project area occurring in the "exceptional" Nolichucky Gorge Natural Heritage Natural Area contains intact, standing trees.

83. Upon information and belief, the Pisgah National Forest approved the Poplar timber sale as a direct sale (i.e., without appraisal, advertisement, and open bidding) to a private logger in September 2025.

84. The Forest Service did not consult with the North Carolina Natural Heritage Program about the Poplar timber sale before authorizing that sale. In addition, the Pisgah National Forest did not complete site-specific NEPA review in an EIS, EA, or CE.

85. The Forest Service is relying on the expired Emergency NEPA Authorization to satisfy its NEPA responsibilities for the Poplar timber sale.

86. As noted above, the Emergency NEPA Authorization authorized salvage harvest of specific, mapped areas that were to be under contract prior to May 1, 2025.

87. The Poplar timber sale was not identified as an authorized salvage project in the Emergency NEPA Authorization or the request that preceded it and was not under contract prior to May 1, 2025.

88. The Poplar timber sale also does not meet the Emergency NEPA Authorization's criteria. The Project area is not in the wildland-urban interface; no debris in the Project area is blocking existing access routes; it is approximately 4.5 miles from the Appalachian Trail at its closest point by land (near Devils Creek Gap) and over 2 miles and a large river crossing away

from Indian Grave Gap; and the Project area does not pose any particular risk to municipal water supplies downstream.

## Attempts by the Public to Learn More About the Project

89.     On September 11, 2025, National Forests in North Carolina Forest Supervisor James Melonas executed a closure order for the Poplar timber sale Project area. U.S. Forest Serv., Forest Order #08-11-08-25-08 (Sept. 11, 2025) (Exhibit 2).

90.     The closure order did not identify the reason for the closure, apart from noting it was "for the protection of public health and safety following Tropical Storm Helene." *Id.*

91.     On September 18, 2025, the Forest Service posted the closure order on its website but did not otherwise circulate the closure order to interested members of the public.

92.     Although the Forest Service's website includes a page for active "Timber Sales," the Forest Service did not update this page or otherwise publicly post any timber sale documents, contracts, or environmental review documents for the Poplar timber sale.

93.     In mid-October, local community members encountered the closure order at the Poplar Boat Launch adjacent to the Project area. These members informed Plaintiffs about rumors of imminent logging on or about October 21, 2025.

94.     On October 23, counsel for Plaintiffs reached out to the Forest Service to ask why the area was closed. Forest Supervisor James Melonas confirmed that the area was closed for salvage logging and put Plaintiffs in touch with Acting Supervisor Fitzsimmons to discuss the Project further.

95.     Defendant Fitzsimmons was not available until the morning of October 28, 2025, at which time he spoke to Plaintiffs' counsel by phone. Defendant Fitzsimmons explained that the Project was made possible because the Forest Service was able to use CSX's temporary bridge and had found a willing logger. He also explained that the Project was already under

23

contract by direct sale and that the loggers were "moving in" and would likely be on site the following morning. Defendant Fitzsimmons further explained that the Forest Service had not prepared a separate decision document for the Poplar timber sale but was instead relying on the prior emergency authorization. He also indicated he was willing to investigate further to learn when logging would begin and whether the North Carolina Heritage Program had been consulted. Finally, Plaintiffs' counsel asked for documentation of the Project's scope. At the time of this filing, no such documentation has been shared.

96.     Plaintiffs' counsel visited the Project area the morning of October 29, 2025. At that time, logging and road construction in the Project area had already begun.



Figure 6: Logging in Project Area, October 29, 2025

97.     Plaintiffs' counsel again contacted Defendant Fitzsimmons and Defendant Barnhart on October 31, 2025, to let them know to expect a letter expressing grave concerns about the Project.

98.     Plaintiffs' counsel sent that letter later by email in the afternoon of October 31, 2025. The letter, attached as Exhibit 3, requested a response and/or meeting by November 4, 2025.

99.     On November 4, 2025, Defendants responded by email, attached as Exhibit 4. In the letter Defendants stated the Project was covered by the Emergency NEPA Authorization as the "Annie's Cove storm debris salvage" project and referred Plaintiffs to the Authorization. *See* Ex. 4 at 1. As explained above, however, the Emergency NEPA Authorization did not apply to

the Poplar timber sale. The two mapped areas identified as "Annie's Cove" in that letter do not

include the area covered by the Poplar timber sale. *See* Figure 7.



Figure 7: Approximate Poplar timber sale polygon and
approved Annie's Cove salvage polygons.

100.    Later in the day on November 4, 2025, Plaintiffs' counsel notified Defendants that

the Poplar timber sale involves a separate project area from the Annie's Cove project and invited

Defendants to clarify their position. Defendants did not respond.

101.    Again on the morning of November 5, 2026, Plaintiffs' counsel contacted

Defendants, offering another chance to avoid litigation by committing to limit logging and road

construction in the Backcountry and Old Growth Network portions of the Project area and by

mitigating the spread of non-native invasive plants. Plaintiffs' counsel informed Defendants that

absent such commitments, they would file suit on the morning of November 6, 2025. Defendants did not respond to that entreaty, either.

102.    Logging is continuing in the Project area. CSX was originally required by the U.S. Army Corps of Engineers to remove the temporary bridge providing access to the Project area by November 4, 2025, but has requested to instead remove the bridge around November 17, 2025. Accordingly, upon information and belief, the Forest Service intends the Project to be completed by November 17, 2025.

## CLAIMS FOR RELIEF

### Claim 1: The Forest Service Violated NEPA and the APA by Failing to Conduct a NEPA Study of the Poplar Timber Sale.

103.    Plaintiffs incorporate by reference paragraphs 1 to 102.

104.    The Forest Service's decision to authorize the Poplar timber sale was a final agency action for purposes of APA review and is therefore subject to NEPA.

105.    The Poplar timber sale was not authorized using a CE.

106.    The Poplar timber sale has reasonably foreseeable effects on the environment.

107.    These effects are significant, or, at the very least, uncertain. Therefore, the Forest Service should have prepared an EIS or EA to assess the environmental impacts of the Project. 42 U.S.C. § 4332(2)(C).

108.    The Poplar timber sale is not covered by the Forest Service's February 26, 2025 Emergency NEPA Authorization.

109.    Because the Forest Service did not conduct a NEPA study of the Poplar timber sale, it violated the APA by acting "without observance of procedure required by law." 5 U.S.C. § 706(2)(D); *see* 42 U.S.C. § 4332. Alternatively, the Forest Service's continuing failure to

conduct a NEPA study for the Poplar timber sale constitutes "agency action unlawfully withheld or unreasonably delayed," in violation of the APA. 5 U.S.C. § 706(1); *see* 42 U.S.C. § 4332.

**Claim 2: The Forest Service Violated NFMA and the APA by Failing to Adhere to the Forest Plan.**

110. Plaintiffs incorporate by reference paragraphs 1 to 102.

111. Under NFMA, any activity that occurs on a national forest "shall be consistent" with the governing forest plan. 16 U.S.C. § 1604(i); 36 C.F.R § 219.15(d).

112. The Poplar timber sale is governed by the Pisgah Forest Plan.

113. The Poplar timber sale is inconsistent with the Forest Plan in at least five ways.

114. First, the Forest Service failed to consult with the North Carolina Natural Heritage Program before authorizing the timber sale.

115. Second, the Forest Service failed to conduct required field surveys for rare and listed species before authorizing the timber sale.

116. Third, the Poplar timber sale is inconsistent with standards and guidelines for the Backcountry management area.

117. Fourth, the Poplar timber sale is inconsistent with standards and guidelines for the Designated Old Growth Network.

118. Fifth, the Poplar timber sale is inconsistent with standards and guidelines for the Wild and Scenic Rivers management area.

119. Because the Forest Service violated the Forest Plan in approving the Poplar timber sale, the agency acted arbitrarily and capriciously, not in accordance with law, and "without observance of procedure required by law," in violation of NFMA and the APA. 5 U.S.C. § 706(2); *see* 16 U.S.C. § 1604. Alternatively, the Forest Service's continuing failures to conduct environmental studies required by the Forest Plan for the Poplar timber sale constitute

"agency action unlawfully withheld or unreasonably delayed," in violation of the APA. 5 U.S.C.

§ 706(1); *see* 42 U.S.C. § 4332.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

A.      DECLARE that the U.S. Forest Service violated the National Environmental

Policy Act, National Forest Management Act, and Administrative Procedure Act in the respects

set forth above;

B.      VACATE and set aside any instrument purporting to allow the removal of timber

from the Poplar timber sale Project area;

C.      ENJOIN Defendants from proceeding with the Poplar timber sale until they have

complied with the law;

D.      AWARD Plaintiffs their reasonable costs, fees, and expenses, including attorney's

fees, associated with this litigation; and

E.      GRANT Plaintiffs such further and additional relief as the Court may deem just

and proper.

Respectfully submitted, this the 6th day of November, 2025.

/s/ Clara Derby
Clara Derby
N.C. Bar No. 62330
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Ave, Suite 304
Asheville, NC 28801-3321
Telephone: 828-258-2023
Facsimile: 828-258-2024
cderby@selc.org

/s/ Spencer Scheidt
Spencer Scheidt
N.C. Bar No. 57078

SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Ave, Suite 304
Asheville, NC 28801-3321
Telephone: 828-258-2023
Facsimile: 828-258-2024
sscheidt@selc.org

/s/ Sam Evans
Sam Evans
N.C. Bar No. 44992
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Ave, Suite 304
Asheville, NC 28801-3321
Telephone: 828-258-2023
Facsimile: 828-258-2024
sevans@selc.org

*Counsel for Plaintiffs*