## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION

MOUNTAINTRUE and CENTER    )
FOR BIOLOGICAL DIVERSITY   )
   )
      Plaintiffs,    )
   )
    v.    )    Civil Case No. 1:25-cv-00393
   )
THE UNITED STATES FOREST   )
SERVICE, ACTING FOREST   )
SUPERVISOR CAVAN   )
FITZSIMMONS, and   )
APPALACHIAN DISTRICT   )
RANGER JEN BARNHART,   )
   )
      Defendants.   )
   )

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF COMBINED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## **INTRODUCTION**

In February 2025, the U.S. Forest Service authorized the use of emergency procedures for a suite of salvage logging projects across the Pisgah National Forest, allowing those projects to be implemented before analysis under the National Environmental Policy Act ("NEPA") could be completed. That authorization applied to a specific list of approved projects, accompanied by a map showing those projects' locations, and set a May 1, 2025 deadline to have those projects under contract.

This case challenges a separate logging project developed in September 2025: the Poplar timber sale. This project was not included in the emergency authorization. Nevertheless, the Forest Service is attempting to rely on that inapplicable authorization to excuse its failure to perform any NEPA analysis on the Project whatsoever. This violates NEPA.

To make matters worse, the Poplar timber sale is facially inconsistent with the governing Pisgah Forest Plan and thus violates the National Forest Management Act ("NFMA"). Because portions of the project area fall within a state-designated natural area, the Forest Service was required to consult with the State before acting—yet it failed to so. Other portions of the project area overlap with the agency's Designated Old Growth Network, requiring the Forest Service to

1

perform a site-specific analysis of the effects to old growth, but the Forest Service skipped this requirement too.

Over the past two weeks, Plaintiffs ("Conservation Groups") have urged the Forest Service to follow the law and reign in the most concerning aspects of the timber sale. Rather than doing so, the agency incorrectly asserted that the Poplar timber sale is covered by its February 2025 emergency authorization. When Conservation Groups confronted the Forest Service with its own words and maps establishing the contrary, the agency failed to respond.

Though some Forest Service staff are currently furloughed due to the government shutdown, logging is occurring now and may finish as soon as November 17, 2025. Because work continues apace—causing irreparable harms—and because the Forest Service has refused to remedy its violations of law, Conservation Groups had no choice but to initiate litigation to preserve what remains of the project area's exceptional values. Conservation Groups now seek emergency relief enjoining the Poplar timber sale until the Forest Service complies with applicable laws. Because of the situation's exigent nature, Conservation Groups respectfully request, and Defendants agree, that this Court rule on their request for a temporary restraining order by November 12, 2025.

# FACTUAL BACKGROUND

In late February 2025, the Pisgah National Forest sought and received authorization from the Forest Service's Washington Office to conduct emergency salvage logging in multiple project areas using "alternative procedures" under NEPA, provided that those timber sales were under contract by May 1, 2025. *See* ECF No. 1-3. That authorization was explicitly limited to 15 named projects comprising 53 distinct, mapped polygons. *See id.* at 5, 10–12. In that authorization, the Forest Service did not seek or receive approval to conduct salvage logging where it is currently occurring near the community of Poplar, North Carolina.

Months after the May 1, 2025 deadline had passed, the Pisgah National Forest executed a direct sale (i.e., without appraisal, advertisement, or open bidding) to a private logger. That sale covered an approximately 135-acre project area near Poplar, at the head of the Nolichucky River Gorge (the "Poplar timber sale" or "Project"). ECF No. 1-4. Before entering into this contract, the Forest Service did not notify the public or conduct an environmental review pursuant to NEPA. Instead, the Forest Service took the position that this Project was covered by the February emergency authorization. Ex. 1 ¶¶ 6, 27; ECF No. 1-6.

The Forest Service proceeded to sell the timber at issue without conducting analyses or consultation required by the Pisgah Forest Plan ("Forest Plan"). As described in more detail below, forest plans set "standards" or "guidelines"—

3

mandatory constraints with which all future projects, like the Poplar timber sale, must comply.

Among other things, the Forest Plan requires the Forest Service to coordinate with the North Carolina Heritage Program ("NCHP") early in the development of projects in state-designated Natural Heritage Natural Areas. U.S. Forest Serv., *Nantahala and Pisgah National Forests Final Land Management Plan* at 81, R8 MB-160 (Jan. 2023) (hereinafter "Forest Plan").[1] Large portions of the Project area at issue occur in the Nolichucky Gorge National Heritage Natural Area. Ex. 1 ¶ 17. However, the Forest Service failed to contact the NCHP before plowing ahead with the Poplar timber sale. Ex. 2 ¶ 16.

In addition, because portions of the Project area are within the Forest Plan's "Designated Old Growth Network," Ex. 1 ¶ 15, the Forest Plan also required the agency to conduct a "project specific analysis" of the Poplar timber sale's impacts to "old growth values and characteristics," Forest Plan at 85. Because the Forest Service is relying on a decision pertaining to *other* project areas, however, the agency did not conduct the required site-specific analysis for *this* Project area before selling the timber within the Old Growth Network.

---

[1] The Court may take judicial notice of this public record and other public Forest Plan documents cited below. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). These documents are publicly available at: https://www.fs.usda.gov/r08/northcarolina/planning/nantahala-and-pisgah-forest-plan.

4

Logging has now begun in the Project area. Ex. 1 ¶¶ 5, 9, 29. The logging stands to kill—and may have already killed—rare and protected species, exacerbate sedimentation issues in the Nolichucky River, introduce non-native invasive species, and degrade old-growth stands in the Forest. Ex. 3 ¶¶ 10, 12–14, 16–21. These effects threaten irreparable harm to Conservation Groups and their members. *See infra* at 18–21.

As noted above, the Forest Service has insisted that it was not required to perform environmental analyses before logging began because the Project is covered by its February emergency authorization. Ex. 1 ¶¶ 6, 27; ECF No. 1-6. Specifically, the agency claimed that the Project is a part of the "Annie's Cove" salvage project approved for treatment in February. ECF No. 1-6. Not so. Ex. 1 ¶¶ 27–28. When Conservation Groups pointed out that the Poplar timber sale does not overlap with the Annie's Cove project area, the agency did not respond. *Id.* ¶¶ 30–32.

The Forest Service is currently accessing the Project area using a temporary bridge installed during a railroad reconstruction project that finished earlier this year. Ex. 2 ¶ 14. According to the railroad's permits, the bridge was to be removed by November 4, 2025, but now it appears the Forest Service has asked the railroad to keep the bridge in place until around November 17, 2025. Ex. 1 ¶ 23. In the interim, loggers are rushing to get timber out of the Project area. Ex. 2 ¶ 14.

5

After becoming aware of the Project on or around October 21, 2025, Conservation Groups repeatedly petitioned the Forest Service to provide them with documentation of the Project and to commit to limitations needed to avoid the worst impacts. Ex. 1 ¶¶ 24–35. Specifically, Conservation Groups asked the Forest Service to commit that logging would be limited to the area of significant blowdown, that Backcountry and Old Growth Network limitations would be respected, and that other harms would be mitigated. *Id.* ¶¶ 30, 35. The Forest Service declined to provide any documentation or make those commitments. *Id.* ¶¶ 24–35.

Satellite imagery taken on November 6, 2026, shows that logging is in fact occurring in the portion of the Project area designated as Backcountry and Old Growth Network, and within the North Carolina Natural Heritage Area. *Id.* ¶ 29. To preserve what remains of the Project area's resource values, Conservation Groups now ask this Court to temporarily enjoin Defendants' approval of this logging project.

## LEGAL BACKGROUND

### I.    National Environmental Policy Act

NEPA has twin aims: "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed

considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (quotations and citations omitted).

NEPA's twin objectives are "realized through a set of action-forcing procedures that require that agencies take a hard look at environmental consequences [and] provide for broad dissemination of relevant environmental information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quotations omitted).

These action-forcing procedures require agencies to complete certain requirements for "every" "proposal[]" for "major Federal action." 42 U.S.C. §§ 4332, 4336. A "proposal" exists if "an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects." *Id.* § 4336e(12). A "major Federal action" means "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10).

If a proposal for major federal action "has a reasonably foreseeable significant effect on the quality of the human environment," the agency "shall issue" a "detailed" "environmental impact statement" ("EIS"). *Id.* §§ 4332(2)(C), 4336(b)(1). If a "proposed agency action . . . does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the

7

significance of such effect is unknown," then the agency "shall prepare" a "concise" "environmental assessment" ("EA") that "set[s] forth the basis of such agency's finding of no significant impact or determination that an [EIS] is necessary." *Id.* § 4336(b)(2). Agencies are relieved of the obligation to prepare an EA or EIS only if the agency "finds that the proposed agency action" is categorically excluded from further review or NEPA study is barred by "another provision of law," *Id.* § 4336(b)(2), and documents that finding, 7 C.F.R. § 1b.3(g).

Critically, the documentation for an EIS, EA, or categorical exclusion ("CE") must be prepared *before* the action can begin, *id.* §§ 1b.3(j); 1b.6(f); 1b.8(e), unless the Forest Service has an emergency authorization to proceed "before the NEPA process can be completed," *id.* § 1b.9(w). For an EIS-level analysis, such an authorization must be jointly approved by the Department of Agriculture and the Council on Environmental Quality. *Id.* § 1b.9(w)(2). For an EA- or CE-level analysis, the emergency authorization may be issued by the Forest Service's Chief or Associate Chief. *Id.* § 1b.9(w)(1)(iv). In any case, emergency authorizations are limited to "actions necessary to address the emergency circumstance." *Id.* §§ 1b.9(w)(1)–(2).

## II.    National Forest Management Act

NFMA requires the Forest Service to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National

8

Forest System." 16 U.S.C. § 1604(a). Land and resource management plans, also known as forest plans, "provide a framework for where and how certain activities can occur in national forests." *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582, 600 (4th Cir. 2018).

The bones of this framework are forest plan "standards" and "guidelines" that govern all future projects, including timber harvests. A "standard" is a "mandatory constraint on project and activity decisionmaking, established to help achieve or maintain the desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements"; a "guideline" is also a constraint on future projects, but it "allows for departure from its terms, so long as the purpose of the guideline is met." 36 C.F.R. §§ 219.7(e)(1)(iii)–(iv).

Any activity that occurs on a national forest "shall be consistent" with the governing forest plan, including the plan's standards and guidelines. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15(d).

## STANDARD OF REVIEW

A temporary restraining order or preliminary junction "preserve[s] the relative positions of the parties until a trial on the merits can be held." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (citation and quotation omitted). The standard for granting a temporary restraining order is the same as for granting a preliminary injunction. *See DOL v. Wolf Run Mining Co.*, 452 F.3d 275,

281 n.1 (4th Cir. 2006). In either case, the party seeking emergency relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

Conservation Groups challenge Defendants' failure to comply with NEPA and NFMA under 5 U.S.C. §§ 706(1) and (2). Pursuant to § 706(1), a reviewing court must "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). Agency action is unlawfully withheld, and must be compelled, where "an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Under § 706(2), a reviewing court must "set aside agency action[s], findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedures required by law." 5 U.S.C. § 706(2).

## ARGUMENT

### I. Conservation Groups have standing.

An organization has standing by virtue of its individual members' standing so long as the organization "seeks to protect interests germane to [its] purpose" and individual members' participation is not required. *Friends of the Earth, Inc. v.*

10

*Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000) (*en banc*). Here, the interests Conservation Groups seek to protect are central to their missions, and the claims and remedies in this action do not require the participation of individual members. Ex. 2 ¶¶ 9–13, 24–26; Ex. 3 ¶¶ 4, 6–8, 16–17, 22–23.

Individual members have standing where they meet the familiar three-part test: (1) injury-in-fact, (2) causation, and (3) redressability. *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 283 (4th Cir. 2018). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quotation omitted).

Conservation Groups' members have suffered concrete injuries, including harms to their economic, recreational, aesthetic, and scientific interests. *See, e.g.*, Ex. 2 ¶¶ 10–13, 17–23; Ex. 3 ¶¶ 3–4, 16–21; Ex. 4 ¶¶ 7–11; Ex. 5 ¶¶ 4–5, 10–13. Those injuries are directly traceable to Defendants' unlawful authorization of the Project. *See* Ex. 2 ¶¶ 14–18, 21–23; Ex. 3 ¶¶ 12, 16–17, 22; Ex. 4 ¶¶ 7–10; Ex. 5 ¶¶ 4–6, 10–13. The injuries would be redressed by a favorable ruling requiring Defendants to comply with their legal obligations, which would reduce harm to the Conservation Groups' members' use and enjoyment of the Project area and the Nolichucky River. *See* Ex. 2 ¶ 26; Ex. 3 ¶ 24; Ex. 4 ¶ 11; Ex. 5 ¶ 14.

11

## II. Conservation Groups are likely to succeed on the merits of their claims.

Conservation Groups are likely to succeed on their claims that the Forest Service violated NEPA and NFMA. The Poplar timber sale falls outside of the emergency authorization issued by the Forest Service on February 26, 2025, and accordingly the Forest Service must comply with NEPA by some other means. They have failed to do so. The Poplar timber sale is also inconsistent with multiple provisions in the 2023 Forest Plan. For both reasons, the Poplar timber sale should be enjoined.

### a. The Forest Service failed to comply with NEPA.

There is no dispute that the Forest Service is required to comply with NEPA for the Project. The Forest Service has acknowledged as much. ECF No. 1-6 (acknowledging the agency will prepare a NEPA study after the Project is completed). The only question is whether the agency's February 26, 2025 emergency NEPA authorization allows the Forest Service to defer NEPA compliance until after it finishes logging in the Project area. It does not. The Forest Service therefore erred by failing to perform any NEPA analysis before authorizing the Project.

The February 26, 2025 emergency authorization does not apply to the Project for three reasons.

**First**, the emergency NEPA authorization only approved salvage logging at 53 specific, mapped locations, or "polygons" as described in the authorization, comprising 15 different salvage projects. ECF No. 1-3 at 5, 10–12. The Poplar timber sale's location was not included in this authorization. *See id.*; *see also* Ex. 1 ¶¶ 27–28. While the Forest Service contends that the Poplar timber sale is part of the Annie's Cove salvage project, ECF No. 1-6, that project is clearly distinct from the Poplar timber sale, *see* Ex. 1 ¶ 28; *compare* ECF No. 1-4, *with* ECF No. 1-3 at 5. Therefore, the emergency authorization does not apply to the Project.



Figure 1: Approximate Poplar timber sale polygon and approved Annie's Cove salvage polygons. Ex. 1 ¶ 28.

**Second**, the emergency NEPA authorization contemplated that all approved salvage projects would be under contract before May 1, 2025. *See* ECF No. 1-3 at 3 (confirming that the approved "list of debris removal mapped polygons . . . would be contracted prior to May 1, 2025"). Indeed, during interagency consultation on the emergency authorization, the U.S. Fish & Wildlife Service explained that "activities not started or contracted by May 1, 2025" would undergo routine environmental review procedures. Ex. 6 at 2. The date of the contract for the Poplar timber sale is not publicly known because the Forest Service has declined to provide the contract or other documentation. Upon information and belief, however, the Forest Service did not enter into a contract for the Poplar timber sale until months after this May 1 deadline. Accordingly, the February 26, 2025, emergency authorization does not apply twice over.

**Third**, the emergency NEPA authorization does not apply to the Poplar timber sale by its own terms. That authorization only covered activities where one or more of the following criteria were met: (1) the project area occurred within the wildland-urban interface; (2) debris blocked existing access for a prescribed fire unit or inholdings; (3) the proposed project was in close proximity to the Appalachian Trail; or (4) the project area posed a risk to downstream primary municipal drinking water sources. ECF No. 1-3 at 3.

14

Here, however, the Poplar timber sale is not in the wildland-urban interface, Ex. 1 ¶ 18; there is no debris blocking access for a prescribed fire unit or inholding, *see* ECF No. 1-4 (showing no inholdings within or access to the western portion of the Project area); the Project area is more than four miles from the Appalachian Trail by land, Ex. 1 ¶ 19; and the Project area does not pose a risk to downstream municipal water sources, *id.* ¶ 20. Thus, the emergency authorization does not apply under its own criteria.

Because the emergency authorization does not apply to the Project—and the Forest Service did not comply with NEPA by any other means before approving the Project—the Poplar timber sale was authorized "without observance of procedure required by law" in violation of Section 706(2) of the APA. 5 U.S.C. § 706(2)(D); *see also Humane Soc'y of U.S. v. Johanns*, 520 F. Supp. 2d 8, 16 (D.D.C. 2007) ("NEPA . . . requires that federal agencies take a "hard look" at the environmental consequences of their projects *before* taking action." (emphasis added)). Alternatively, because the requirement to prepare an EA or EIS is "a discrete agency action that [Defendants are] required to take," *Norton*, 542 U.S. at 64, the Forest Service's failure to conduct a NEPA study is an agency action unlawfully withheld in violation of the APA. 5 U.S.C. § 706(1).

### b. The Forest Service failed to comply with NFMA.

The Forest Service also violated NFMA by failing to adhere to binding standards and guidelines in the 2023 Forest Plan. *See* 16 U.S.C. § 1604(i) (mandating all activities on a national forest unit "shall be consistent" with the governing forest plan); 36 C.F.R. § 219.15(d) (same). A plan standard "is a mandatory constraint on project and activity decisionmaking." 36 C.F.R. § 219.7(e)(1)(iii). A plan guideline "is a constraint on project and activity decisionmaking that allows for departure from its terms, so long as the purpose of the guideline is met." *Id.* § 219.7(e)(1)(iv). While the Project is inconsistent with multiple plan requirements, two inconsistencies stand out.

*First*, the Project is inconsistent with Plan guideline PAD-G-02. That guideline provides that when a state-designated Natural Heritage Natural Area is present within a project area, "coordination should occur with the [North Carolina] Natural Heritage Program early during project development to discuss the unique ecological values present, their locations, the representativeness and quality of these values, and potential management treatments." Forest Plan at 81. According to the Forest Service, this guideline "require[s] the Forests to coordinate with the State Natural Heritage Program for projects in NHNAs," and the purposes of the guideline are to "ensure collaboration with the State agency" and to "ensure that the unique ecological values of the area are considered when designing projects."

16

U.S. Forest Serv., *Forest Plan Attachment A: Final Response to Objection Issues and Instructions* at 140 (Jan. 2023).

Here, large portions of the Project area occur in the Nolichucky Gorge Natural Heritage Natural Area. Ex. 1 ¶ 17. Yet the Forest Service did not consult with the North Carolina Natural Heritage Program before authorizing the timber sale at issue. Ex. 2 ¶ 16. Nor did the Forest Service otherwise meet the purposes of the guideline because no effort was made to "ensure collaboration with the State agency" and "ensure the unique ecological values" of the Project area were considered. That violates the 2023 Forest Plan and NFMA.

*Second*, the Project is inconsistent with standard OGN-S-01. That standard provides that "vegetation manipulation" in the Designated Old Growth Network must be accompanied by "project specific analysis" showing that it is needed for one or more enumerated purposes. Forest Plan at 85. Because it failed to perform any analysis for the Poplar timber sale, the Forest Service has not completed the required "project specific analysis" of the Project's effects on old growth values in violation of OGN-S-01.

### III. Conservation Groups will continue suffering irreparable harm if an injunction is not granted.

For purposes of emergency relief, harm is irreparable when it "[cannot] be remedied by money damages at the time of judgment." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). Conservation Groups do not seek money damages,

17

rather their injuries are to their aesthetic, recreational, professional, and scientific interests in the environment. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d 251, 264 (4th Cir. 2020) (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987)). A plaintiff's aesthetic and recreational interests are irreparably harmed by actions that impair their ability to use and enjoy national forest system lands. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

The Project is currently causing and will continue to cause Conservation Groups and their members irreparable harm absent an injunction. Ex. 2 ¶¶ 13, 15, 17–18, 21–24; Ex. 3 ¶¶ 16–22; Ex. 4 ¶¶ 4, 7–10; Ex. 5 ¶ 5–7, 10–13.

The Project has already encroached on Backcountry, Old Growth, and Natural Heritage areas where rare and protected species likely occur. Ex. 1 ¶ 29. Conservation Groups' members value visiting the Gorge in part due to its incredible biological and botanical diversity and the presence of rare and protected species like piratebush and bats. Ex. 2 ¶ 13; Ex. 3 ¶¶ 4, 14, 16. Without the requisite project surveys and expert coordination, a logger can easily wipe out a rare ecological community that exists only in tiny patches on the landscape. Ex. 2 ¶

18

15. The Project thus threatens Conservation Groups' members' ability to view, study, and appreciate these species and ecosystems.

The Project also harms aquatic species and ecosystems that Conservation Groups' members are interested in. Ex. 2 ¶¶ 17, 21; Ex. 3 ¶¶ 8, 18. The Project area is very steep, with large portions having over a 70% grade. Ex. 1 ¶ 21; Ex. 2 ¶ 17. Indeed, during the forest planning process, the Forest Service found that it lacked the technological capability to use ground-based equipment to log on slopes over 70% without unlawfully causing permanent impairment of soils. U.S. Forest Serv., *Final Environmental Impact Statement for the Nantahala-Pisgah Forest Plan* at App'x B-47 to B-49 (2023). The soils are also loose and rocky. Ex. 2 ¶ 17. Building logging roads and using heavy equipment in this environment will disturb soils and cause erosion—potentially even landslides—sending sediment into the Nolichucky River. Ex. 2 ¶ 17; Ex. 3 ¶¶ 17, 19; Ex. 5 ¶ 10. Sedimentation degrades water quality and harms aquatic species like the endangered Appalachian elktoe mussel and the proposed-endangered Eastern hellbender and has cascading effects downstream and throughout the ecosystem that Conservation Groups' members study and enjoy. Ex. 2 ¶¶ 17, 21; Ex. 3 ¶¶ 8, 18–19.

The Project will also degrade the scenic value of the Project area. Logging roads cut into the mountain will be visible from across the river at the Poplar Boat Launch. Ex. 4 ¶¶ 7–10; Ex. 5 ¶ 10. Logging will affect how the area would

naturally recover from the storm damage by disturbing soils and removing downed woody debris that would otherwise recycle back into the ecosystem. Ex. 3 ¶ 11. Logging also carries the high risk of introducing non-native invasive species. Ex. 2 ¶ 22; Ex. 3 ¶ 10. Where the view once was a mature, biodiverse forest undergoing natural processes, it will become a site of obvious human disturbance absent an injunction. Ex. 3 ¶ 21.

For Conservation Groups' members who live near and visit the Project area to experience raw nature, this impact to the viewshed will be irrevocable. Ex. 3 ¶ 21; Ex. 4 ¶¶ 7–10; Ex. 5 ¶¶ 10–13. This harm is especially pronounced for MountainTrue member Patrick Toups, whose property borders the Poplar Boat Launch and whose viewshed is directly in line with the Project area. Ex. 4 ¶ 3. He purchased this property to enjoy the area's scenic values and to establish a visiting artists program inspired and surrounded by the wild nature of the Nolichucky River Gorge. *Id.* ¶¶ 8–9. He has already built a sculpture garden with the Project area as the intentional backdrop which has now been turned into an active and growing logging site. *Id.* ¶ 8. Mr. Toups's aesthetic and professional interests will be irreparably harmed if the Project continues unabated.

## IV.  The balance of harms and the public interest justify granting injunctive relief.

The third and fourth emergency relief factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Conservation

20

Groups, their members, and the public generally have a strong, well-recognized interest in "[t]he preservation of our environment, as required by NEPA and the NFMA." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1177 (9th Cir. 2006), *abrogated on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is generally no public interest in the perpetuation of unlawful agency action.").

Even though the Project has been partially implemented, biological and scenic values important to Conservation Groups would be preserved if the Forest Service is enjoined from continuing this unlawful Project. *Alliance for the Wild Rockies*, 632 F.3d at 1131, 1139 (holding that conservation groups were still entitled to emergency relief even after "49% of the [challenged] logging was complete[]"); *see* Ex. 2 ¶¶ 12–13, 15, 18, 26; Ex. 3 ¶¶ 8, 11–12, 16–21; Ex. 4 ¶¶ 7–10. Suspending logging until requisite environmental consideration can occur "comports with the public interest." *Alliance for the Wild Rockies*, 632 F.3d at 1138; *see also North Carolina v. City of Va. Beach*, 951 F.2d 596, 603 (4th Cir. 1991) (noting the Fourth Circuit has favored "injunctions when a NEPA review is required and has not been conducted").

An injunction would result in coordination between the Forest Service and the North Carolina Natural Heritage Program to identify populations of rare plants

21

Conservation Groups' members are interested in before species' habitats are unknowingly destroyed. *See* Forest Plan at 81; *see also* Ex. 2 ¶¶ 15–17. Further, if the requisite NEPA analysis is undertaken, members of the public can suggest needed mitigation measures to ensure any future temporary access roads will be thoughtfully located and existing ones will be adequately removed. Ex. 2 ¶¶ 17, 23; Ex. 4 ¶¶ 7–8. These steps would protect against sedimentation and landslides and minimize permanent scenic impacts to Conservation Groups' members. Ex. 2 ¶¶ 17, 21; Ex. 3 ¶ 19; Ex. 4 ¶¶ 7–10; Ex. 5 ¶¶ 10, 13.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should grant Conservation Groups' request for a Temporary Restraining Order and Preliminary Injunction. Due to the exigent nature of the situation, Conservation Groups respectfully request, and Defendants agree, that the Court rule on Conservation Groups' request for a temporary restraining order by November 12, 2025.

Respectfully submitted this the 7th day of November, 2025.

/s/ Clara Derby
Clara Derby
N.C. Bar No. 62330
SOUTHERN ENVIRONMENTAL LAW
CENTER
48 Patton Ave, Suite 304
Asheville, NC 28801-3321
Telephone: 828-258-2023

22

Facsimile: 828-258-2024
cderby@selc.org

s/ Spencer Scheidt
Spencer Scheidt
N.C. Bar No. 57078
SOUTHERN ENVIRONMENTAL LAW
CENTER
48 Patton Ave, Suite 304
Asheville, NC 28801-3321
Telephone: 828-258-2023
Facsimile: 828-258-2024
sscheidt@selc.org

/s/ Sam Evans
Sam Evans
N.C. Bar No. 44992
SOUTHERN ENVIRONMENTAL LAW
CENTER
48 Patton Ave, Suite 304
Asheville, NC 28801-3321
Telephone: 828-258-2023
Facsimile: 828-258-2024
sevans@selc.org

*Attorneys for Conservation Groups*

23

## CERTIFICATION REGARDING THE USE OF ARTIFICIAL INTELLIGENCE

Pursuant to this Court's Standing Order entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this Memorandum, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this Memorandum has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 7th day of November, 2025.

/s/ Clara Derby
Clara Derby

24