# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### Case No. 1:25-cv-00393-MR-WCM

MOUNTAINTRUE and CENTER FOR )
BIOLOGICAL DIVERSITY, )
                                )
      Plaintiffs, )
                                )
      v. )
                                )
UNITED STATES FOREST SERVICE, )
*et al.*, )
                                )
      Defendants. )
_____ )

## DEFENDANTS' RESPONSE IN OPPOSITION
## TO PLAINTIFFS' COMBINED MOTION FOR TEMPORARY
## RESTRAINING ORDER AND PRELIMINARY INJUNCTION [DKT. 8]

# **TABLE OF CONTENTS**

FORTHCOMING

# I.    INTRODUCTION AND BACKGROUND

Hurricane Helene made landfall on September 26, 2024, and traced a disastrous path of more than 600 miles from Florida to Virginia. It has become one of the deadliest storms in North Carolina, with over 230 reported deaths. Some estimates say the storm caused $250 billion in damage to the Southeast. In North Carolina and Tennessee, landscapes were most impacted by heavy rain, flash flooding, landslides, and downed trees. Record rainfall and rapidly rising water levels overwhelmed drainage systems, leading to widespread flooding. Debris flows and landslides have altered the topography. Helene caused significant damage to roads, trails, infrastructure, and natural resources. The magnitude of damage related to this incident cannot be overstated and appears unprecedented in Western North Carolina, eclipsing the Great Flood of 1916.

Due to the devastating storm impacts, there are continuing urgent needs related to public safety and the protection of infrastructure and resources on National Forest System lands. One action that addresses these urgent and unsafe conditions, and the action relevant here, is debris removal of dead and dying trees in areas of forest blowdown using commercial salvage sales. These dead and dying trees create extreme fuel loads on forests, present a significant risk of catastrophic wildfire, and threaten public safety. And if a fire were to break out, the debris hinders fire suppression and increases the risk to emergency responders. The

1

presence of these trees also impedes other recovery efforts that can only occur after the debris is removed, such as replanting and reforestation and reconstruction of Forest Service infrastructure and recreation facilities.

In late February 2025, the Chief of the United States Forest Service approved a request for an Emergency Response under 36 C.F.R. § 220.4(b)(2) to allow debris removal in certain areas through commercial salvage sales. Ex. 1 at 9. The Emergency Response allows salvage sales to proceed prior to preparing any site-specific analysis and associated documentation that ordinarily would be required by the National Environmental Policy Act ("NEPA"). The Emergency Response is consistent with the intent of the NEPA and contains safeguards. For example, the Forest Service must consult Tribes and comply with the Endangered Species Act, National Historic Preservation Act, Clean Water Act, and Executive Orders for floodplains and wetlands. Ex. 1 at 4, 7-8. The Forest Service must also account for the probable environmental consequences of the emergency action and mitigate foreseeable adverse environmental effects to the extent practical. *Id.* at 9. The Emergency Response does not require public comment, but the Forest Service has engaged with the public and elected officials through public meetings, website updates, media blasts, and phone calls. Ex. 2 at ¶¶ 54-58.

The Forest Service is proceeding with salvage sales allowed by the Emergency Response. One of the salvage sales, the Annie's Cove Salvage Sale

(the "Sale"), is ongoing and is the subject of this litigation. The Sale authorizes the removal of dead and dying trees on 94 acres of National Forest System land on the western side of the Nolichucky River in Yancey County. Ex. 2 ¶ 37; Ex. 3 at 2. As shown in this March 2025 photo of the debris removal site, there is extensive blowdown and high fuel loading:



Ex. 2 ¶ 20. Annie's Cove is within a high-use area and is considered at great risk for severe wildfire behavior because of its inaccessibility, steep terrain, significant number of dead and down trees, proximity to the railroad, past wildfire history, and lack of preexisting barriers to impede wildfire growth.

3

The Forest Service awarded the Annie's Cove Salvage Sale to Blue Ridge
Grading and Trucking, a small business located in Burnsville, on October 22. Ex. 2
¶ 40; Ex. 3 at 2. Operations on the Sale began on October 23; the Sale is 30%
complete as of November 7. Ex. 2 ¶¶ 41, 42. The Sale is using the temporary
bridge that CSX installed to rebuild its railroad after the storm. *Id.* ¶ 39; *see Am.
Whitewater v. U.S. Army Corps of Engr's*, No. 1:24-cv-00284-MR-WCM, 2025
WL 1142311 (W.D.N.C. Mar. 20, 2025). The temporary bridge will be removed by
CSX in November 2025, so work must conclude before then and is anticipated to
conclude by November 17. Ex. 2 ¶ 39. Using the alternative hauling route, once the
CSX bridge is removed, would prolong the time it would take to complete the
salvage sale and could make this a less feasible salvage sale, leaving high amounts
of heavy fuels on the ground. Ex. 2 ¶ 44.

Two weeks after operations began, Plaintiffs filed suit. Echoing some claims
in *American Whitewater* (No. 1:24-cv-00284-MR-WCM), Plaintiffs allege the Sale
is unlawful because it is not covered by the Emergency Response and violates
NEPA and the National Forest Management Act ("NFMA").[1] The next day,
Plaintiffs moved for emergency injunctive relief.

---

[1] Plaintiffs attempt to create confusion by rebranding the Sale as the "Poplar timber
sale." There is no record support for this nomenclature, which Plaintiffs
presumably take from the name of a boat launch destroyed by Hurricane Helene.
The boat launch was on the opposite side of the Nolichucky River and in a
different county. The timber sale contract names the "Annie's Cove Salvage Sale,"

Plaintiffs establish none of the elements necessary for emergency injunctive relief required by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). First, Plaintiffs fail to show a likelihood of success on the merits. The crux of their NEPA claim is that the Forest Service must conduct additional analysis and documentation before it can approve the Sale. But the Sale satisfies all terms of the Emergency Response, and the Sale can proceed under this alternative NEPA arrangement. Plaintiffs' NFMA claim alleges the Sale does not comply with Forest Plan guidelines for Natural Heritage Natural Areas and old growth. But the Forest Service coordinated with the relevant state agency and analyzed impacts to designated old growth areas as required by the Forest Plan. Second, Plaintiffs fail to show the balance of equities and public interest favor an injunction. There is a significant risk of wildfire in the Sale area and conditions threaten public safety. Delay will also impede medium- and longer-term recovery and restoration efforts on the Forest. Finally, Plaintiffs are not likely to suffer irreparable harm absent injunctive relief. If the timber sale is restrained, the Court should require Plaintiffs to post a bond in the amount of $64,396, the financial cost to the Forest Service if the contract is terminated.

The Court should deny Plaintiffs' motion and allow the Sale to proceed.

---

Ex. 3 at 2, and the Forest Service has consistently referred to the salvage area as "Annie's Cove" with numeric identifiers for specific units. *See, e.g.*, Ex. 4 at 15 (identifying Annie's Cove Salvage 01, 02, and 04).

## II. STATUTORY AND REGULATORY BACKGROUND

### A. National Environmental Policy Act

NEPA requires federal agencies to consider the environmental consequences of proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "NEPA imposes no substantive environmental obligations or restrictions. NEPA is a purely procedural statute…." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 173 (2025). Federal agencies ordinarily fulfill their procedural obligations under NEPA by preparing an environmental impact statement, an environmental assessment, or a categorical exclusion. 42 U.S.C. §§ 4336(b)(1), 4336(b)(2), 4336(e)(1); *see also* 7 U.S.C. §§ 1b.3, 1b.4, 1b.5, 1b.7.

NEPA acknowledges that it may not be possible to fully comply with procedure, as the statute itself mandates that agencies comply "to the fullest extent possible." 42 U.S.C. § 4332. Relevant here, the Chief or Associate Chief of the Forest Service may "determine[] that an emergency exists that makes it necessary to take urgently needed actions before preparing a NEPA analysis and any required documentation…." 36 C.F.R. § 220.4(b).[2] The Chief or Associate Chief may grant

---

[2] In July 2025, the U.S. Department Agriculture issued an interim final rule on the Department's regulations implementing NEPA. 90 Fed. Reg. 29,632 (July 3, 2025). The new regulations for emergencies are codified at 7 C.F.R. § 1b.9(v) and (w)(1)(iv), but the interim final rule is prospective. 90 Fed. Reg. at 29,644.

emergency alternative arrangements under NEPA for environmental assessments, findings of no significant impact, and categorical exclusions. 36 C.F.R. § 220.4(b)(2). Alternative arrangements for actions that may need to be documented in an environmental impact statement require consultation with the Council on Environmental Quality. *Id.* § 220.4(b)(3). The allowance for emergency alternative arrangements "aligns with common sense – complying with burdensome reporting in the face of an emergency is generally not feasible or prudent." *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, No. 2:16-cv-0293-TOR, 2017 WL 2962771, at *4 (E.D. Wash. July 11, 2017), *aff'd* 726 F.App'x 605 (9th Cir. 2018).

**B.** **National Forest Management Act**

NFMA establishes a two-step procedure for managing National Forest System lands. 16 U.S.C. § 1604(a), (i); *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30 (1998). First, the Forest Service must "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). Forest plans "guide all natural resource management activities" and "must take both environmental and commercial goals into account." *Ohio Forestry*, 523 U.S. at 729. Second, the Forest Service must ensure that all "[r]esource plans and permits, contracts, and other instruments for

---

Because the Emergency Response was signed in February, the NEPA regulation codified at 36 C.F.R. § 220.4(b) applies.

the use and occupancy of National Forest System lands [are] consistent with the [forest plan]." 16 U.S.C. § 1604(i).

Forest plans must contain the following components: desired conditions, objectives, standards, guidelines, and suitability of lands. 16 U.S.C. § 219.7(e)(1). Relevant here are standards and guidelines. A standard "is a mandatory constraint on project and activity decisionmaking." *Id.* § 219.7(e)(2). A guideline "is a constraint on project and activity decisionmaking that allows for departure from its terms, so long as the purpose of the guideline is met." *Id.* § 219.7(e)(3).

## III.   <u>STANDARD OF REVIEW</u>

A plaintiff seeking a preliminary injunction must demonstrate that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent injunctive relief; (3) the balance of the equities tips in its favor; and (4) the injunction would be in the public interest. *Winter*, 555 U.S. at 20. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id*. at 24. Failure to satisfy any one factor precludes relief. *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018). A plaintiff's entitlement to preliminary injunctive relief is a matter of discretion with the Court. *See id.* at 438. The standard for granting a temporary restraining order is the same. *See U.S. Dep't of Labor v. Wolf Run Mining Co.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006).

8

## IV.   ARGUMENT

### A.   Plaintiffs are not likely to succeed on the merits of their claims.

Plaintiffs fall far short of their burden to show a likelihood of success on either the NEPA or NFMA claims.

### 1.   The Sale complies with NEPA.

The Emergency Response allows the Sale to proceed prior to preparing a separate NEPA analysis. 36 C.F.R. § 220.4(b)(2). The Emergency Response identifies, as one of three covered actions, the need to reduce significant fuel loading across the Forest and within the wildland urban interface, and specifies when and where debris removal may occur. Ex. 1 at 3-4. The Emergency Response requires the Forest Service to "take into account the probable environmental consequences of the emergency action and mitigate foreseeable adverse environmental effects to the extent practical during implementation." Ex. 1 at 7. The Forest Service has done so here, and has satisfied NEPA's purpose to consider the environmental consequences of an action before proceeding. 42 U.S.C. § 4332(2)(C); *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 179 ("[t]he central principle of judicial review in NEPA cases is deference"); *Forest Serv. Emps. for Env't Ethics*, 2017 WL 2962771, at *5 (noting that the Forest Service's emergency NEPA regulations "compliment, rather than contradict, NEPA.").

9

Plaintiffs allege the Sale is inconsistent with the Emergency Response in three ways. Pls.' Memo. in Supp. of Combined Mot. for TRO and Prelim. Inj. ("Pls.' Br.") 12-15, Dkt. 9. None have merit. Plaintiffs' desire for additional paperwork would serve no purpose and would impede the Forest Service's urgent need to address the catastrophic damage left in the wake of Hurricane Helene.

*a. The Sale is within a suitable area identified in the Emergency Response.*

Plaintiffs first argue the Emergency Response does not apply to the Sale area because it is not one of fifty-three polygons identified in the February 2025 authorization. Pls.' Br. 13. Plaintiffs misread the Emergency Response and fail to acknowledge subsequent analysis and compliance documents from the Forest Service and other agencies that support the Forest Service's determination that the Emergency Response applies to the Sale area.

The Emergency Response identifies locations suitable for debris removal and explicitly identifies the Annie's Cove area. Ex. 1 at 5 (map), 11 (identifying Annie's Cove Salvage 01 (45 acres) and 02 (133 acres). But the Emergency Response should not be rigidly interpreted to exclude more specific locations in need of debris removal, especially where, as here, other locations are in the same general area and less than one mile away. The Emergency Response acknowledges the identification of suitable areas is ongoing; it notes the immense acreage of estimated debris removal (150,000 acres) and says, "[t]he Pisgah National Forest

has identified to date 2,202 acres that are viable for debris removal via commercial salvage sales." Ex. 1 at 3. The Emergency Response also includes a map that provides "a general overview of the magnitude and scale of the proposed actions" and coarsely delineates proposed covered areas. *Id.* at 4, 5 (map).

As access to the area improved and the feasibility of salvage sales were further assessed, the Forest Service identified an additional 107 acres in need of salvage and named this "Annie's Cove Salvage 04." Ex. 2 ¶ 19; Ex. 4 at 15. The Forest Service consulted with the Fish and Wildlife Service on Annie's Cove Salvage 04. The Fish and Wildlife Service's June 16 concurrence included the following map of Annie's Cove Salvage 04:



**Figure 1C. New Appalachian District Salvage Unit**

11

Ex. 4 at 13. The June 16 concurrence also notes that the acreage was "[n]ot identified until May due to accessibility issues. The area is located 0.75 miles north of Annie's Cove Salvage 02 in a Healthy Forest Restoration Act ("HFRA") Wildland Urban Interface ("WUI") adjacent to the CSX railroad tracks. The railroad is a high probability ignition source for starting wildfires." Ex. 4 at 15. Since it was identified, the Forest Service has included Annie's Salvage 04 as a refined polygon in communications with other consulting and state agencies. *See infra* Part IV.A.2 (satisfying consultation requirements as required by NFMA).

> b. *The Sale will be completed within the time allowed by the Emergency Response.*

Plaintiffs also argue the Sale is not covered by the Emergency Response because it was not entered into until October 2025. Pls.' Br. 14. But this argument misunderstands the Emergency Response to require all contracts implementing the commercial salvage operations for the authorized debris removal to be executed by May 1, 2025. It does no such thing.

The Background section of the Emergency Response describes the needed debris removal and says that the "list of debris removal mapped polygons (*see* attachment – enclosure A, Table 1) would be contracted prior to May 1, 2025, with contracts closing by May 1, 2026." Ex. 1 at 4. Plaintiffs read this sentence to require that all debris removal contracts must be executed before May 1, 2025, to be covered by the Emergency Response. But this is merely an aspirational date set

forth in the Background, as reflected by use of the term "would" (a modal verb used to express a plan or intention)[3] rather than a mandatory term such as "shall" or "must." It reflects a plan or intention to execute contracts before May 1, 2025, but it does not establish a mandatory requirement to do so. Indeed, to find otherwise would require rewriting the Emergency Response to say that the debris removal "must be contracted by May 1, 2025."

Plaintiffs cite a January 2025 letter from the Fish and Wildlife Service to create a mandatory date that is not in the Emergency Response itself. Pls.' Br. at 14 (citing Pls.' Ex. 6). The text of the Emergency Response controls over purported interpretations by others. *See Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) (citing cases for the bedrock principle of textual interpretation); *United States v. Ward*, 972 U.S. 364, 369 (4th Cir. 2020). Additionally, the Fish and Wildlife Service's understanding is irrelevant; the Fish and Wildlife Service has no role in the Forest Service's NEPA process and Plaintiffs raise no claims under the Endangered Species Act. Moreover, the Forest Service has been in frequent contact with the Fish and Wildlife Service since January and completed consultation on Annie's Cove 04 in June. Ex. 4 at 2-3 (identifying communication dates); *id.* at 13 (Figure 1C, identifying Annie's Cove 04 as a "New Appalachian District Salvage

---

[3] *See* https://www.merriam-webster.com/dictionary/would (last visited November 8, 2025).

Unit"). The Fish and Wildlife Service's June 17 concurrence does not repeat the language from January. Instead, the June concurrence notes that salvage contracts "were originally planned to be contracted before May 1, 2025" and that Annie's Cove 04 "was not identified until May 2025 due it being inaccessible." *Id.* at 6.

    *c. The Sale satisfies the Emergency Response's terms for debris removal.*

    Finally, Plaintiffs argue none of the four terms from the Emergency Response apply to the Sale. Pls.' Br. 14-15. Only one is required, and at least two are satisfied.

    The Sale satisfies the first criterion because it is located within an established Health Forest Restoration Act Wildland Urban Interface. Ex. 1 at 5; Ex. 5 at 2 (2020 map, lands in blue). Forest Service GIS specialists have again confirmed that the Sale is in the WUI. Ex. 6 at 2 (close-up of Ex. 4 with WUI in blue, approximate location of the Sale area as a red dot); Ex. 7 at 2 (detailed map).

    Plaintiffs claim the Sale is outside the WUI. Pls.' Br. 14 (citing Evans Decl. ¶ 18). This allegation is based solely on their own counsel's lay interpretation of a public-facing database that documents changes in the WUI at the national level between 1990 and 2020 and is intended to support wildland fire research, policy, and management. Ex. 8 at 2. This database does not provide an authoritative determination of which lands on a particular National Forest are eligible for treatment. Indeed, the landing page for the database expressly disclaims: "[t]his

WUI feature class is separate from the WUI datasets maintained by individual forest unites [sic], and it is not the authoritative source data of WUI for forest units." *Id.* Additionally, the database Plaintiffs rely on "shows change over time in the WUI data *up to 2020*." *Id.* (emphasis added). In April 2020, the Forest Service updated HFRA-designated lands to include almost all National Forest Service lands in North Carolina, including the Sale area. Ex. 5 at 2; Ex. 6 at 2 (red dot).

The Court should defer to the Forest Service GIS expert's determination of Forest-specific maps that the Sale area is in the HFRA WUI, not Plaintiffs' counsel's lay interpretation of a website that does not contain current information for this Forest. *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377 (1989) ("Because analysis of the relevant documents requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies." (citations and quotation omitted)); *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 288 (4th Cir. 1999) ("Agencies are entitled to rely on the view of their own experts.").

The Sale also satisfies the Emergency Response's third criterion for debris removal because there is accumulated woody debris and hazardous fuels in close proximity to the Appalachian Trail. Ex. 1 at 5. The Appalachian Trail is *within* the wildland fire operational area of the Annie's Cove area, which means that there is not a good fire break between the Annie's Cove area and the Trail. Ex. 2 ¶ 29. The

best firebreak to hold a wildland fire is west of the Trail, meaning that the trail could be at risk should a fire begin in the Annie's Cove area. *Id.* Plaintiffs' counsel claims the "Project area is more than four than miles from the Appalachian Trail by land." Evans Decl. ¶ 19. But the Emergency Authorization does not specify what constitutes "close proximity." In the context of wildland fire, which can travel rapidly across the landscape, the Court should defer to the Forest Service's expert assessment that the Sale area is "close" to the Appalachian Trail. *Marsh*, 490 U.S. at 377; *Hughes River Watershed*, 165 F.3d at 288.

In sum, the Sale satisfies the terms of the Emergency Response. The Court should find that Plaintiffs have not met their burden to show they are likely to succeed on the merits of their NEPA claim.

2. The Sale is consistent with the Forest Plan and complies with NFMA.

The Forest Service also documented how the Sale is consistent with the Forest Plan, as required by NFMA. 16 U.S.C. § 1604(i).

Plaintiffs first allege the Sale is inconsistent with Forest Plan guideline PAD-G-02. Pls.' Br. 16-17. This guideline provides that when a state-designated Natural Heritage Natural Area is present, "coordination should occur with the [North Carolina] Heritage Program early during project development to discuss the unique ecological values present, their locations, the representativeness and quality of these values, and potential management treatments." Ex. 9 at 3. The Forest

Service is coordinating with the North Carolina Heritage Program about hurricane response efforts, including activities in Annie's Salvage 04. Ex. 10 at 3-5 (March 28, 2025 email to North Carolina Natural Heritage Program); Ex. 11 at 2-4 (April 4, 2025 response); Ex. 12 at 2 (May 16, 2025 email to heritage consulting agencies with attachment entitled, "AnniesCove04 GIS data May 16 THPOs.zip").

The *only* support for Plaintiffs' allegation that the Forest Service did not consult with the North Carolina Heritage Program is a conclusory statement from one of their declarants. Pls.' Br. 16 (citing Pls.' Ex. 2 ¶ 16). This statement is wrong; the Forest Service complied with guideline PAD-G-02.

Plaintiffs next allege the Sale is inconsistent with Forest Plan standard OGN-S-01. Pls.' Br. 17. This standard expressly allows for vegetation manipulation (such as the removal of salvage trees) in patches identified as part of the Forest's designated old growth network with a project specific analysis. Ex. 9 at 4. There are no requirements for the format of this analysis. *See id.* The salvage area includes approximately 20 acres of one designated old growth network patch, which is less than 0.5% of the total 4,444-acre patch on a Forest with approximately 265,385 acres of designated old growth. Ex. 2 ¶ 33. In May, the Forest Service added Annie's Cove 04 to its review spreadsheet for designated old growth and later mapped the Sale area in relation to the designated old growth analysis. Ex. 12 at 2; Ex. 14 at 2 (map). As the District Ranger explains, "downed

trees within this old growth patch can become a vector for the spread of disease into the rest of the patch, as well as to adjacent lands. The heavy load of down and dying trees also creates an increased fuel risk to the patch." Ex. 2 ¶ 34. Debris removal in this area is consistent with standard OGN-S-01 because it will both prevent the spread of the disease and improve forest health. Ex. 9 at 4; Ex. 2 ¶ 35.

Plaintiffs assert, with no support, that the "Forest Service has not completed the required 'project specific analysis' of the Project's effects on old growth values." Pls.' Br. at 17. It has.

The Sale complies with guideline PAD-G-02 and standard OGN-S-01 and thus satisfies NFMA's requirement to be consistent with the Forest Plan. The Court should find that Plaintiffs have not met their burden to show they are likely to succeed on the merits of their NFMA claim.

**B.**   **The balance of equities and public interest favor allowing the Sale to proceed.**

Because Plaintiffs fail to show a likelihood of success on the merits, the Court need not address the merits of Plaintiffs' claims. *Winter*, 555 U.S. at 20; *Henderson*, 902 F.3d at 439. Should the Court consider these factors, they favor allowing the ongoing Sale to proceed. Courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief [and] [i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences." *Winter*, 555 U.S. at 24

(citations omitted). Those two inquiries merge with respect to the federal government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The Sale addresses the urgent need to mitigate wildfire and public safety risks created by the immense fuel load left in the wake of Hurricane Helene. Ex. 2 ¶¶ 8, 16. Addressing these risks is in the public interest. *Conservation Cong. v. U.S. Forest Serv.*, 774 F. App'x 364, 368 (9th Cir. 2019) (affirming district court's denial of injunctive relief and its finding that "steps to prevent treacherous road conditions caused by fire-killed trees falling on and obstructing public roads, and in mitigating the intensity and severity of future fires outweighs the public interests that support an injunction." (internal citations omitted)). Western North Carolina has "above normal" significant wildfire potential beginning this fall and may be especially problematic next spring in areas most severely impacted by Helene. Ex. 2 ¶¶ 9, 10. The Sale area is within a high-use area and is at especially high risk for severe fire behavior because of its inaccessibility, steep terrain, significant number of dead and downed trees, proximity to the railroad, past wildfire history, and lack of preexisting barriers to impede wildfire growth. Ex. 2 ¶¶ 21, 22. Any fire that ignites in the Annie's Cove area could become a large and complex incident, and suppression would be difficult or impossible and would expose emergency responders to great risk. Ex. 2 ¶¶ 23, 24. The immense amount of debris would inhibit or prevent construction of a mechanical fire line. Ex. 2 ¶ 25.

The effects of wildfire would extend beyond the Sale area's boundary. In the immediate vicinity, there are fifty-two housing units, the Lost Cove historical community, and important infrastructure such as 1.6 miles of high-voltage electric transmission lines. Ex. 2 ¶¶ 26, 27, 29. Wildfire could also impact the Appalachian Trail, which is just four miles away without an effective fire break between the Trail and the Sale area. *Id.* ¶ 29. Wildfire would also create air quality concerns for residents of nearby towns such as Erwin, Tennessee, and travelers along Interstates 26 and 81. *Id.* ¶ 28.

Not only does the Sale allow the Forest Service to quickly reduce risks in and near Annie's Cove, but it also begins the process of medium- and longer-term recovery. Ex. 2 ¶ 12. For example, the Sale area includes approximately twenty acres of one designated old growth network patch. Ex. 2 ¶ 33. Downed trees within this old growth patch can become a vector for the spread of disease into the rest of the patch, as well as to adjacent lands. *Id.* ¶ 34. Removing the downed trees will both prevent the spread of disease and improve forest health within the old growth patch and nearby lands. *Id.* ¶ 35. Additionally, reforestation and revegetation efforts are currently planned for Spring 2026. *Id.* ¶ 46. Delaying debris removal will delay intervention, which will create a greater risk of undesirable and non-native species to become established in the Sale area. *Id.* Finally, the Poplar Boat Launch that was destroyed in the hurricane is expected to be rebuilt by late Spring

2026 and will be used by rafting companies and hundreds of visitors on peak summer days. *Id*. ¶ 31. Where, as here, so many other benefits flow from a project, enjoining that project is not in the public interest. *See, e.g.*, *Earth Island Inst. v. Carlton*, No. CIV. S-09-20202 FCD/EFB, 2009 WL 9084754, at *28 (E.D. Cal. Aug. 20, 2009), aff'd, 626 F.3d 462 (9th Cir. 2010) (issuance of injunction would not be in public's interest because defendants offered evidence that if the project did not proceed, "the public w[ould] lose the benefits of the reforestation efforts, which w[ould] expedite forest regeneration, recover forested conditions, prevent domination of shrub species, and repair habitat structure for wildlife….").

Plaintiffs allege the equities and public interest favor an injunction. Pls.' Br. 20-22. First, they claim biological and scenic values in the Sale area are important to their members. While these interests may be sincerely held, they fail to acknowledge the devastation wrought by Helene, the extreme amount of debris in the Sale area, or the risk of catastrophic wildfire. In fact, the only mention of "fire" in any of the cited declarations or brief are unsupported statements that "wildfire in the area poses little to no risk to life or property," Pls.' Ex. 2 ¶ 18, and "downed trees in old growth areas…help protect against wildfires," Pls.' Ex. 3 ¶ 16. Plaintiffs fail to reconcile their desire for delay with the urgent need to remove the debris so that ecological restoration can begin. *See supra*.

Plaintiffs next claim that an injunction would allow for coordination with the North Carolina Natural Heritage Program, which has already occurred and is ongoing. *See infra* Part IV.A.2. Plaintiffs also say that injunction would allow them to suggest mitigation measures. The Emergency Response already contains numerous mitigation measures and requires compliance with laws such as the Endangered Species Act and Clean Water Act. Ex. 1 at 7-8. A personal desire to suggest additional mitigation measures does not outweigh the public's interest in allowing the Sale to proceed.

In sum, the amount of debris in the Sale area that needs to be removed now creates significant risks of wildfire and public safety and will speed longer-term recovery and restoration on the Forest. Because Plaintiffs have not met their burden to show the balance of equities and public interest favor an injunction, the Court should deny their motion.

## C. <u>Plaintiffs fail to show imminent, irreparable harm.</u>

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. A showing of the "possibility of irreparable harm" is not insufficient. *Id.* A plaintiff "must make a clear showing of irreparable harm and the required irreparable harm must be neither remote nor speculative, but actual and imminent." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) (cleaned up).

Issuing a preliminary injunction based only on the possibility of irreparable harm is inconsistent with the characterization of injunctive relief as an extraordinary remedy that may be awarded only upon a clear showing that the plaintiff is entitled to such relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

The Court need not consider this element because Plaintiffs have failed to establish any of the other elements necessary for a preliminary injunction. *Winter*, 555 U.S. at 20; *Henderson*, 902 F.3d at 439. Should the Court consider this element, it should find that Plaintiffs' allegations of irreparable harm are speculative and based on worries about their personal life or financial well-being. *Am. Whitewater*, 2025 WL 1142311, at *10; *Native Ecosystems Council v. Krueger*, 40 F. Supp. 3d 1344, 1349 (D. Mont. 2014) ("generalized allegations of an abstract environmental injury resulting from the Project's logging activities is insufficient to constitute irreparable harm required for an injunction.").

**D.**    **<u>If the Court enjoins activities, Plaintiffs are required to post a bond.</u>**

Although Plaintiffs have not met their burden to show entitlement to emergency injunctive relief, if the timber sale is restrained, the Court should require Plaintiffs to post a bond in the amount of $64,396.

Federal Rule of Civil Procedure 65(c) preconditions the issuance of a restraining order on "the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred

or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "This rule is mandatory and unambiguous," and a court "is not free to disregard the bond requirement altogether." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999). In determining the bond amount, a "court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Id.* at 421 n.3. This amount should cover the potential "losses the unjustly enjoined or restrained party will suffer during the period he is prohibited from engaging in certain activities." *Id.* (quotation omitted).

The timber sale must be fully implemented before CSX removes the temporary bridge at the end of November. Ex. 2 ¶ 39. If a TRO prevents that from occurring, the Forest Service will have to terminate the timber sale contract. *Id.* ¶ 48. Under Section B8.341(b) of that contract, the purchaser is entitled to: "(i) refund or release of advanced deposits for timber cut but not removed, (ii) reimbursement for Out-of-Pocket Expenses, and (iii) replacement timber under subparagraph (c), and/or liquidated damages under subparagraph (d)." Ex. 3 at 23. As detailed in the Declaration of District Ranger Barnhart, the Forest Service

reasonably estimates that termination of the contract will result in a loss of $64,396 to the Forest Service.[4] Ex. 2 ¶ 48.

Though Plaintiffs' motion asks the Court to require only a nominal bond, Pls.' Mot. 5, their declarations provide no information on their financial condition or ability to post a bond. *See* Dkts. 9-2, 9-4, 9-5, 9-3. The most recently publicly available IRS 990 forms show that both MountainTrue and the Center have substantial financial resources. In 2022, MountainTrue reported more than $2.2 million in revenue and net assets of more than $1.6 million. Ex. 15 at 2. In 2020, the Center reported more than $27.3 million in revenue and net assets of more than $28.0 million. Ex. 16 at 2.

If a TRO is entered, Plaintiffs should be required to post a bond in the amount of $64,396. This amount is just 0.2% of their combined net assets.

## V. CONCLUSION

The Sale complies with the Emergency Response and addresses the urgent need to reduce debris left in the wake of Hurricane Helene. The Court should deny Plaintiffs' motion.

---

[4] The Forest Service estimated the $64,396 in damages as follows: refund or release of advance deposits ($230), contractor mobilization costs ($8,000), operator's cost of implementation ($48,840), and a liquidation charge ($7,326). Ex. 2 ¶ 48.

Respectfully submitted on this 10th day of November, 2025.

RUSS FERGUSON
United States Attorney

*s/ Gill P. Beck*
Gill P. Beck
Assistant United States Attorney
Chief, Civil Division
N.C. State Bar No. 13175
Room 233, U.S. Courthouse
100 Otis Street
Asheville, North Carolina 28801
(828) 271-4661
Gill.Beck@usdoj.gov

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*s/ John P. Tustin*
JOHN P. TUSTIN (TX Bar No. 24056458)
Senior Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone:    (202) 305-3022
Fax:       (202) 305-0275

*Attorneys for Defendants*

## <u>CERTIFICATION</u>

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated this 10th day of November, 2025.

*/s/   John P. Tustin*
JOHN P. TUSTIN

# EXHIBIT LIST

| Exhibit | Title/Description |
|---------|-------------------|
| 1 | Emergency Response Authority (signed February 26, 2025) |
| 2 | Declaration of Jennifer Barnhart, District Ranger for the Appalachian Ranger District, National Forests in North Carolina (signed November 10, 2025) |
| 3 | Timber Sale Contract for "Annie's Cove Salvage Sale," October 22, 2025 |
| 4 | June 17, 2025 letter from the Fish and Wildlife Service to the U.S. Forest Service entitled, "Emergency Consultation Update for Response to Impacts of Hurricane Helene on the Pisgah, Nantahala, and Cherokee National Forests in Western North Carolina and Eastern Tennessee." |
| 5 | National Map, National Forest System Lands Designated Under Section 602 of the Healthy Forest Restoration Act (created on May 5, 2020 with data valid as of April 14, 2020) |
| 6 | Annotated close-up of National Forest System Lands Designated Under Section 602 of the Healthy Forest Restoration Act (created on May 5, 2020 with data valid as of April 14, 2020) |
| 7 | Map from Forest Service GIS specialist with the Annie's Cove Area overlaid on the Forest's map of HFRA designated lands (created November 10, 2025) |
| 8 | Screenshot of landing page for "Wildland Urban Interface: 2020", available at https://data-usfs.hub.arcgis.com/documents/ 7804d89ed1094ccb9aae753228e8d89a/explore (last visited November 7, 2025) |
| 9 | Nantahala and Pisgah National Forests, Forest Plan, January 2023 (excerpts) |

| 10 | Email to North Carolina Natural Heritage Program with attachment (excerpt) (dated March 27, 2025 and September 19, 2025) |
|---|---|
| 11 | Letter from North Carolina Natural Heritage Program (dated April 4, 2025) |
| 12 | Email to heritage consulting agencies (dated May 16, 2025) |
| 13 | Email showing addition of Annie's Cove 04 to designated old growth network analysis spreadsheet (date May 21, 2025) |
| 14 | Map showing Sale area in relation to designated old growth network on the forest (draft created October 22, 2025 and finalized on November 7, 2025) |
| 15 | IRS Form 990, MountainTrue, 2022 (excerpt). Complete 990 from 2022 and other years available at https://apps.irs.gov/app/eos/ (last visited November 8, 2025) |
| 16 | IRS Form 990, Center for Biological Diversity, 2020 (excerpt). Complete 990 from 2020 and other years available at https://apps.irs.gov/app/eos/ (last visited November 8, 2025) |

Citations to the page numbers in the exhibits are to the pdf page number and include the exhibit cover page as the first page. This pagination corresponds with the ECF file stamp.