IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| MOUNTAINTRUE and CENTER FOR BIOLOGICAL DIVERSITY, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Case No. 1:25-cv-00393-MR-WCM |
| UNITED STATES FOREST SERVICE, ACTING FOREST SUPERVISOR CAVAN FITZSIMMONS, and APPALACHIAN DISTRICT RANGER JEN BARNHART, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF COMBINED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## INTRODUCTION

The Forest Service's Poplar timber sale (the "Project") violates the National Environmental Policy Act ("NEPA") and the National Forest Management Act ("NFMA"). The agency cannot dodge its NEPA responsibilities by citing an emergency authorization that Defendants themselves concede does not apply. Nor can Defendants excuse their NFMA violations by misrepresenting facts and pointing to post-hoc litigation affidavits. Because there is no public interest in the perpetuation of unlawful activity, and because the Project is already irreparably harming Plaintiffs' ("Conservation Groups'") members, this Court should grant Conservation Groups' motion for emergency relief.

## ARGUMENT

### I. The Poplar timber sale is not covered by the February 26, 2025 emergency NEPA authorization.

Despite Defendants' efforts to muddle the matter, the Forest Service's emergency NEPA authorization does not apply to the Poplar timber sale.

As Defendants begrudgingly acknowledge, the Poplar timber sale—which Defendants refer to as the "Annie's Cove Salvage 04" unit—was <u>not</u> included in the agency's February 26, 2025 emergency authorization. *See* ECF No. 11-4 at 6 (admitting that the Annie's Cove Salvage 04 unit was identified in May 2025). They argue, however, that the emergency authorization "should not be rigidly

1

interpreted to exclude" work on salvage units "in the same general area" as units approved in February.¹ ECF No. 11 at 10.

But that is exactly how the emergency authorization says it must be interpreted. According to the Forest Service Chief, the emergency NEPA "authority is *limited* to proposed debris removal areas . . . as displayed on the [February authorization's] Hurricane Helene Recovery Projects Map and described in Enclosure A." ECF No. 1-3 at 8 (emphasis added). Because the Poplar timber sale unit is not included on that map or in Enclosure A, *see id.* at 5, 11, the February emergency authorization does not apply.² And because that authorization does not apply, the Forest Service's decision to approve the Poplar timber sale before completing an environmental analysis violates NEPA.

## II. The emergency NEPA authorization's criteria do not cover the Project.

Location aside, the Project area does not meet any of the Forest Service's criteria for including areas in the February 2025 emergency authorization, further showing that the Project could never have been part of that authorization.

---

¹ Defendants point out that the "Annie's Cove Salvage 01" and "02" units *were* a part of the February emergency authorization. ECF No. 11 at 10. But as Defendants concede, these units are spatially "separate" from the Poplar timber sale/Annie's Cove Salvage 04. ECF No. 11-2 ¶ 19.

² Tellingly, the Forest Service felt the need to update its Endangered Species Act consultation to include the Project. *See* ECF No. 11-4. It did not do the same for its emergency NEPA authority.

2

Case 1:25-cv-00393-MR-WCM    Document 12    Filed 11/11/25    Page 3 of 13

As the Forest Service explained, all projects covered under the emergency authorization were required to meet one or more of four criteria. ECF No. 1-3 at 10. Defendants do not dispute that two of these criteria are not satisfied, but they claim that the Project satisfies the other two. Specifically, they argue that (1) the Project occurs in the Healthy Forests Restoration Act Wildland-Urban Interface and (2) the Project is "in close proximity to the Appalachian Trail." ECF No. 11 at 14–16. The first argument is a blatant misrepresentation of the facts and the second is a post-hoc rationale unsupported by the record.

*First*, the Project is not within the Wildland-Urban Interface. Defendants' argument to the contrary misrepresents the evidence.

Defendants do not dispute that the Forest Service's own public-facing database shows that the Project is not within the Wildland-Urban Interface. They argue, instead, that their public-facing database is wrong or out of date, and that they properly relied on a *different* map to support their rationale. ECF No. 11 at 15. However, Defendants' new map does not show what they say it does.

Defendants' new map depicts "National Forest System Lands Designated under *Section 602 of the Healthy Forest[s] Restoration Act*," not the Wildland-Urban Interface. ECF No. 11-5 (emphasis added). On this map, the lands designated under Section 602 are colored blue. *Id.* Defendants provide a close-up of this Exhibit purporting to show Wildland-Urban Interface "in blue" and the

3

approximate location of the sale "as a red dot." ECF No. 11 at 14 (citing ECF No. 11-6 at 2). But this conflates areas designated under Section 602 with the Wildland-Urban Interface. Despite Defendants' insinuations, Section 602 has nothing to do with wildfire risk. Instead, Section 602 identifies areas that may be at risk of "insect or disease infestation" in the next 15 years. 16 U.S.C. § 6591a (codifying Section 602). Areas of forest at risk for insect infestation are not the same as those with wildfire risk. And Defendants' map does not purport to show areas of wildfire risk, let alone the Wildland-Urban Interface as defined elsewhere in the Healthy Forests Restoration Act. *See id.* § 6511(16).

While Defendants seek deference to the "informed discretion of the responsible federal agencies," ECF No. 11 at 15, the Court cannot defer to an agency determination based on an obvious misrepresentation of the facts. In sum, the only evidence before the Court bearing on whether the Project is within the Wildland-Urban Interface is the map submitted by Conservation Groups, ECF No. 9-1 ¶ 18, and that map clearly shows that the Project is *not* in the Interface.

***Second***, Defendants' contention that the Project will protect the Appalachian Trail is "no more than [an] impermissible post hoc rationalization[]." *Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 274 (4th Cir. 2022). In its February 2025 authorization, the agency did not cite "proximity to the Appalachian Trail" as a factor in favor of salvage logging either the "Annie's Cove Salvage 01" or "02"

units, even though those units are *closer* to the Appalachian Trail than the Project at issue here. *See* ECF No. 1-3 at 11. And when the Forest Service added the Poplar timber sale/Annie's Cove Salvage 04 unit to the mix months later, it also did not cite proximity to the Trail as a factor supporting logging. *See* ECF No. 11-4 at 15 (identifying the Wildland-Urban Interface as the single criterion supporting logging). Therefore, this Court should reject Defendants' post-hoc attempts to buttress the record. *See Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 467–68 (4th Cir. 2013) ("[A] reviewing court may look only to [an agency's] contemporaneous justifications in reviewing the agency action.").

### III. The Forest Service did not consult with the North Carolina Natural Heritage Program as required.

According to Defendants, the Forest Service "consult[ed]" with the Natural Heritage Program regarding the Project—as required by the Forest Plan—because it sent an email update to several state personnel with a map of the Poplar timber sale and requested comments. ECF No. 11 at 17. However, none of those personnel work at the Natural Heritage Program. *See* ECF No. 11-12 at 2 (merely listing contacts at state and tribal historic preservation offices). According to an actual employee of the Natural Heritage Program, as of October 29, 2025, the "[Natural Heritage Program] has not been consulted" on the Project. Ex. 1 at 2.

5

### IV. The Forest Service did not conduct a project-specific analysis of impacts within the Designated Old Growth Network.

Defendants argue that the Forest Service complied with Forest Plan standard OGN-S-01 by conducting a project-specific analysis of old-growth impacts. ECF No. 11 at 17–18. In support, Defendants state they added the Project to a spreadsheet and "later" mapped the overlap between the Project and the Old Growth Network. *Id.* at 17; ECF No. 11-14 at 2.[3] Defendants also offer a post-hoc litigation affidavit from Defendant Barnhart stating in conclusory fashion that fallen trees in this old-growth patch "can become a vector for the spread of disease" and pose a fire risk. ECF No. 11-2 ¶ 34. None of this evidence remotely qualifies as a pre-implementation, project-specific old-growth analysis.

To start, Defendants' map is not equivalent to an actual analysis. That map merely shows that the Project *occurs* in the Old Growth Network—it does not explain how the Project will *impact* "old-growth values and characteristics" in the Network. *See* Forest Plan at 85 (listing characteristics). Defendants cannot bolster this lack of analysis by adding a conclusory post-hoc litigation affidavit from Defendant Barnhart. *N.C Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 604

---

[3] The map is undated, and Defendants do not clarify how much "later" the map was created. Further, we note that the Forest Service has not reconciled the competing versions of its maps for the Project area. *Compare* ECF No. 11-14 at 2, *with* ECF No. 11-4 at 3. Here, the Forest Service conveniently chooses the version that shows less overlap with the Old Growth Network.

6

(4th Cir. 2012) (holding an agency's analysis must be found in "the administrative record, not subsequent litigation rationalizations"). Because Defendants failed to conduct a project-specific old-growth analysis before authorizing the Project, they violated the Forest Plan and NFMA.

V. **The public interest favors an injunction.**

No matter how well-intentioned the Poplar timber sale is, the Forest Service's approval of that sale violated the law. *See supra.* And there is "generally no public interest" in the "perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). While Defendants argue that their unlawful actions will have indirect benefits, those (supposed) benefits do not obviate Defendants' lawlessness. Congress created laws for agencies to follow; it did not give the Forest Service the authority to take the law into its own hands.

To minimize their unlawful actions, Defendants argue a parade of horribles will follow an injunction—ranging from raging wildfires to downed trees becoming a "vector for the spread of disease." ECF No. 11 at 19–22. But out of the 150,000 total acres of blowdown, *see* ECF No. 11-1 at 3, the Forest Service prioritized a relatively small acreage of salvage logging using risk-based criteria, *and the Project was not a priority under those criteria*. As explained above, the Project is not in the Wildland-Urban Interface, which is the criterion that the Forest Service chose to assess fire risk. ECF No. 11-1 at 4. And, again, the risk of fire to

7

the Appalachian Trail (over 4.5 miles away) was not something the Forest Service was worried about until it had to explain itself in this litigation. *Supra* Section II.

Defendants also overstate the fire-mitigation benefits of their salvage harvest. According to the Natural Heritage Program experts that the Forest Service ignored (*see supra* Section III), salvage logging that "only removes tree boles but leaves the tops of the trees which more readily burn"—like the logging occurring here, *see* ECF No. 9-1 ¶ 9—"may not reduce fire intensity" or fire risk, ECF No. 11-11 at 3. That is because the logger removes the large boles/logs that are less likely to burn and leaves the fine fuels (branches, leaves, tree tops) that are more likely to ignite.

Defendants also try to claim that their illegal salvage logging is essential to ecological recovery. For example, Defendant Barnhart's self-serving declaration claims (without citation to any authority) that logging in the Nolichucky River Gorge and Flattop Mountain Natural Areas and the Old Growth Network will prevent the spread of disease and improve forest health. ECF No. 11-2 ¶¶ 34–35. But according to the Natural Heritage Program experts the agency ignored, "[w]here blowdown occurs within natural areas"—like the Nolichucky River Gorge Natural Area—"leaving some trees on the ground may be less harmful ecologically than removing them." ECF No. 11-12 at 3. Defendants' contrary say-so should be rejected.

8

## VI. An injunction bond is not required here.

Under Federal Rule of Civil Procedure 65(c), the Court "retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 331–32 (4th Cir. 2013), *abrogated on other grounds as recognized by Stinnie v. Holcomb*, 37 F.4th 977 (4th Cir. 2022). Typically, a nominal bond is sufficient in circumstances such as "here where plaintiffs are public interest groups who might otherwise be barred from obtaining meaningful judicial review were the bond required more than nominal." *Red Wolf Coal. v. U.S. Fish & Wildlife Serv.*, 210 F. Supp. 3d 796, 806 (E.D.N.C. 2016) (citing *Nat. Res. Def. Council v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971)). District courts often waive the bond requirement in environmental cases due to the potential chilling effect on public-interest litigation. *Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, 539 F. Supp. 3d 543, 560–61 (D.S.C. 2021) (collecting cases).

Defendants here ask the Court to impose a bond of $64,396 based on an estimate of breach of contract damages[4] to the Forest Service if the timber sale is not "fully implemented before CSX removes the temporary bridge at the end of November." ECF No. 11 at 24. That request is inappropriate for multiple reasons. First, any damages to the Forest Service as a result of their illegal approval of the

---

[4] This is estimate is not supported by any documentation or detailed calculations. ECF No. 11-2 ¶¶ 48–49.

9

timber sale without conducting required environmental reviews should not be borne by Conservation Groups. Second, Defendants' requested bond is grossly disproportionate to the actual value of the timber sale to the Forest Service: $230.75. ECF No. 11-3 at 2. Third, Defendants are incorrect that the Project "must be fully implemented before CSX removes the temporary bridge at the end of November,"[5] ECF No. 11 at 24, because there is an "alternative hauling route" for the Project apart from the bridge, *id.* at 4. Fourth, there is no reason to believe that the Corps of Engineers would not further extend the bridge removal timeline if requested. *See* ECF No. 11-2 ¶ 39. And finally, Conservation Groups here bring this case in the public interest and they "might otherwise be barred from obtaining meaningful judicial review were the bond required more than nominal." *Red Wolf Coal.*, 210 F. Supp. 3d at 807.

## CONCLUSION

For the foregoing reasons, the Court should grant Conservation Groups' request for a Temporary Restraining Order and Preliminary Injunction.

---

[5] Citing ECF No. 11-2 ¶¶ 39 & 48, Defendants' brief states that the Project must be finished before the bridge is removed or else it will have to terminate the timber sale contract. ECF No. 11 at 24. But the cited declaration does not support that proposition, stating instead that "the alternative hauling route . . . *could possibly* make this a less feasible salvage sale." ECF No. 11-2 ¶ 44 (emphasis added). The contract itself runs until December 15, 2025 and by its terms can be extended at the discretion of the contracting officer. ECF No. 11-3 at 1, 23 (Section B8.2).

10

Respectfully submitted, this the 11th day of November, 2025.

s/ Spencer Scheidt
Spencer Scheidt
N.C. Bar No. 57078
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Ave, Suite 304
Asheville, NC 28801-3321
Telephone: 828-258-2023
Facsimile: 828-258-2024
sscheidt@selc.org

/s/ Sam Evans
Sam Evans
N.C. Bar No. 44992
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Ave, Suite 304
Asheville, NC 28801-3321
Telephone: 828-258-2023
Facsimile: 828-258-2024
sevans@selc.org

/s/ Clara Derby
Clara Derby
N.C. Bar No. 62330
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Ave, Suite 304
Asheville, NC 28801-3321
Telephone: 828-258-2023
Facsimile: 828-258-2024
cderby@selc.org

*Attorneys for Conservation Groups*

# CERTIFICATION REGARDING THE USE OF ARTIFICIAL INTELLIGENCE

Pursuant to this Court's Standing Order entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this Memorandum, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this Memorandum has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 11th day of November, 2025.

/s/ Spencer Scheidt
Spencer Scheidt